*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0268P (6th Cir.)
File Name: 04a0268p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

WILLIE WILLIAMS, JR.,
*Petitioner-Appellant,*

*v.*

No. 02-3461

MARGARET BAGLEY, Warden,
*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 00-02103—James Gwin, District Judge.

Argued: January 29, 2004

Decided and Filed: August 13, 2004

Before: MERRITT, ROGERS, and SUTTON, Circuit
Judges.

———————————

## COUNSEL

**ARGUED:** John B. Gibbons, Cleveland, Ohio, for
Appellant. Carol Ann Ellensohn, ATTORNEY GENERAL'S
OFFICE OF OHIO, Columbus, Ohio, for Appellee.
**ON BRIEF:** John B. Gibbons, Cleveland, Ohio, John F.
McCaffrey, McLAUGHLIN & McCAFFREY, Cleveland,
Ohio, for Appellant. Carol Ann Ellensohn, ATTORNEY

———

GENERAL'S OFFICE OF OHIO, Columbus, Ohio, Michael
L. Collyer, ATTORNEY GENERAL'S OFFICE OF OHIO,
Cleveland, Ohio, for Appellee.

ROGERS, J., delivered the opinion of the court, in which
SUTTON, J., joined. MERRITT, J. (pp. 79-88), delivered a
separate dissenting opinion.

———————————

## OPINION

———————————

ROGERS, Circuit Judge. An Ohio jury convicted the
petitioner, William J. Williams, Jr., of four counts of
aggravated murder, and, on the jury's recommendation, the
trial court sentenced Williams to death. After unsuccessfully
challenging his convictions and sentence on direct appeal and
in state post-conviction proceedings, Williams filed a petition
for a writ of habeas corpus, which set forth twenty-four
claims for relief, in the United States District Court for the
Northern District of Ohio. The district court denied
Williams's petition, finding that Williams had procedurally
defaulted the majority of his claims and rejecting the balance
of his claims on the merits. However, it issued Williams a
certificate of appealability for all claims, and Williams's
appeal is now before the court. For the following reasons, we
affirm the judgment of the district court.

### BACKGROUND

**I. THE MURDERS.**

The Ohio Supreme Court made the following factual
findings on direct review:

Williams controlled the drug trafficking at the
Kimmelbrooks housing project in east Youngstown,
Ohio. After an extended absence from the area, Williams
returned to find that Alfonda R. Madison, Sr., William L.

Dent, Eric Howard, and others had taken over the drug trade at the Kimmelbrooks project. Williams wanted to regain control of the drug business, so he decided to rob and kill Madison and others.

Williams had three juvenile accomplices: his sixteen-year-old girlfriend Jessica M. Cherry; her sixteen- or seventeen-year-old brother, Dominic M. Cherry; and Dominic Cherry's seventeen-year-old "cousin" (*i.e.*, best friend), Broderick Boone. On August 27, 1991, Williams bought walkie-talkies at a Radio Shack store. The devices had a combined microphone-earphone earpiece that left the user's hands free. Williams also bought batteries and duct tape. Williams, Dominic, and Broderick later tested the walkie-talkies.

Before the murders, Williams outlined his plan to his three accomplices. During this meeting, Williams drew interior and exterior diagrams of Madison's house. Williams later ordered Dominic to burn these, but Dominic burned only one diagram. In addition, Williams supplied each accomplice with a gun. Williams purchased Jessica's gun from a neighbor.

On September 1, 1991, Jessica met with Madison and discussed a drug deal. Later that night, Williams and his three accomplices arrived at Madison's home by car. Williams armed the three juvenile accomplices with guns and a walkie-talkie and sent them inside, while he waited outside with a walkie-talkie. Once inside, the three accomplices drew their guns on Madison. Then, after receiving word via walkie-talkie that the situation was secure, Williams, armed with a semiautomatic, entered the house carrying a duffel bag containing handcuffs, duct tape, and gloves. Inside, Williams handcuffed and bound Madison and put tape over his mouth.

Thirty to forty-five minutes later, Theodore Wynn, Jr., a recently discharged Air Force sergeant, came to the door, looking for Madison and Howard, who were roommates. Jessica answered the door and told Wynn that Madison was not home and Howard was asleep. As Wynn walked back towards his car, Williams told Jessica to call Wynn back into the house because Wynn could identify them. Inside the house, Williams held Wynn at gunpoint and handcuffed him.

Upon William's orders, Jessica walked to a pay phone and called and asked for Dent for the purpose of luring him to the house. When Dent arrived with Howard, Williams and his accomplices ambushed them and forced them to lie down in the bathroom. Williams strangled Madison and Wynn, and then instructed Jessica to turn up the stereo. Going from room to room, Williams shot each of the four victims in the head with Madison's gun.

The group left Madison's house, but Williams, according to Jessica, went back in "to make sure they were all dead." Later, back at Williams's apartment, he embraced his juvenile accomplices and rewarded them with drugs. Williams warned them not to tell anyone what they had done or he would kill them.

The next day, September 2, 1991, Williams and Jessica were driving to pick up Williams's son in Youngstown when another car rammed theirs and the people in the other car shot at them. Jessica and Williams fled the scene. When Jessica and Williams returned to the vicinity of the accident, officers transported them to the Youngstown Police Department and later released them after questioning them about the traffic accident. Later that night, Williams, Jessica, Dominic, and Broderick fled to Pennsylvania. Williams and the three juveniles returned to the Youngstown area and parted company.

On September 24, 1991, Dominic turned himself in, and gave a statement about the murders. Later, officers arrested Jessica and Broderick, and the latter also gave

statements. Following their arrests, Jessica, Dominic, and Broderick were held at the Mahoning County Juvenile Justice Center ("JJC").

Williams was arrested in connection with the murders. Shortly after being arrested, he escaped from jail on October 15, 1991. While Williams remained a fugitive from justice, a Mahoning County Grand Jury indicted him on four counts of aggravated murder, four counts of kidnapping, and one count of aggravated burglary.

On January 12, 1992, the armed Williams and two other accomplices, Paul R. Keiper, Jr., and a juvenile named Eric Fields, appeared at the JJC. The three deceived a receptionist and were permitted to enter. Once inside, Williams held the receptionist and a deputy sheriff hostage, demanding to see Jessica, Dominic, and Broderick. After lengthy negotiations, Williams surrendered to authorities. At trial, Keiper testified that Williams planned to kill the three juveniles because he knew they had made statements to the police regarding the murders.

\* \* \*

Jessica, Dominic, and Broderick all entered into plea agreements with the Mahoning County Prosecutor's Office. All three pled guilty to delinquency by reason of complicity to aggravated murder, complicity to aggravated burglary, and complicity to kidnapping. All three testified against Williams.

*State v. Williams*, 679 N.E.2d 646, 650-51 (Ohio 1997).[1]

---

[1]"Williams" has been substituted for "the appellant" in this excerpt.

## II. PROCEDURAL HISTORY.

While Williams was a fugitive, a Mahoning County Grand Jury returned a nine count indictment against Williams. After his capture, a Mahoning County Grand Jury returned a superseding indictment charging Williams with twelve counts of aggravated murder, four counts of kidnapping, and one count of aggravated burglary. Each of the aggravated murder counts included a pair of felony-murder specifications and a multiple-murder specification, which rendered Williams eligible for the death penalty. *See* Ohio Rev. Code Ann. § 2929.04(A) (Anderson 2003).

Williams entered a plea of not guilty to all charges and specifications. On Williams's motion, the trial court transferred venue from Mahoning County to Summit County. At the guilt phase of his trial, the jury found Williams guilty of all charges and specifications. On Williams's motion, the trial court merged the twelve aggravated murder counts into four counts and the three specifications per count into a single multiple-murder specification per count. At the penalty phase of his trial, the jury recommended a sentence of death for each count of aggravated murder, and the trial court adopted this recommendation.[2] Additionally, the trial court sentenced Williams for the kidnapping and aggravated burglary convictions.

---

[2]Under Ohio's capital punishment scheme, a jury must recommend a sentence of death if it finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors. Ohio Rev. Code Ann. § 2929.03(D)(2) (Anderson 2003). If the jury recommends a sentence of death, the trial court must independently review the evidence. If it finds, beyond a reasonable doubt, that the aggravating circumstances outweigh any mitigating factors, the trial court must impose a sentence of death. *Id.* § 2929.03(D)(3)

Williams appealed, raising nine assignments of error.[3] On November 1, 1995, the Ohio Court of Appeals affirmed the judgment and sentence of the trial court. In addition to overruling Williams's assignments of error, the court concluded that the aggravating circumstances outweighed the mitigating factors and that Williams's sentence was not disproportionate to the death sentences imposed in similar cases.[4] On June 11, 1997, the Ohio Supreme Court affirmed the judgment of the Ohio Court of Appeals. In addition to rejecting Williams's propositions of law, the court concluded that the aggravating circumstances outweighed the mitigating factors and that Williams's sentence was neither excessive nor disproportionate when compared to the sentences imposed in similar cases. On January 12, 1998, the United States Supreme Court denied Williams's petition for writ of certiorari.

Williams fared no better in state post-conviction proceedings. On September 20, 1996, Williams filed his Petition to Vacate or Set Aside Sentence, which set forth a single cause of action challenging the constitutionality of

---

[3] Specifically, he raised the following issues: (1) juror misconduct; (2) denial of challenges for cause to "automatic death penalty" jurors; (3) sufficiency of the evidence; (4) admission of "other acts" evidence; (5) prosecutorial misconduct; (6) denial of motion to suppress the results of an "atomic absorption" test; (7) limitations on cross-examination of Dominic Cherry; (8) constitutionality of Ohio's capital punishment scheme; and (9) denial of motion to quash the indictment due to irregularities in the selection of the grand jury.

[4] Under Ohio's capital punishment scheme, the Ohio Court of Appeals and the Ohio Supreme Court each must independently review the record and "determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate." Ohio Rev. Code Ann. § 2929.05(A) (Anderson 2003). In determining whether a sentence of death is appropriate, the courts must consider "whether the sentence is excessive or disproportionate to the penalty imposed in similar cases." *Id.*

Ohio's capital punishment scheme, in the Ohio Court of Common Pleas. The matter sat dormant until October 20, 1998, when the state filed a motion for leave to respond to Williams's petition. The court granted the motion, finding that the state had not received proper notice of the petition. On October 29, 1998, the state moved for summary judgment, arguing that Williams's sole claim was barred by the doctrine of res judicata. In his response, which was filed on November 19, 1998, Williams ignored the constitutional issue raised in his petition and instead requested leave to amend his petition. He claimed that he was attempting to interview his accomplices, who had testified against him at trial, and that he expected Jessica Cherry to recant her original testimony.

On December 15, 1998, the court denied Williams's petition. It held that the doctrine of res judicata barred Williams's constitutional challenge to Ohio's capital punishment scheme. Further, it denied Williams a hearing on his actual innocence claim on the ground that he had not presented any affidavits or other evidence supporting his contention that his accomplices intended to recant their testimony.

On December 24, 1998, Williams filed a motion requesting permission to interview Broderick Boone, one of his accomplices, who was then incarcerated. On the same day, Williams filed a motion requesting that the court reconsider and vacate its order denying his petition, arguing that he needed time to interview his accomplices. On January 5, 1999, the court denied both motions.

Williams appealed to the Ohio Court of Appeals, contending that the Court of Common Pleas had abused its discretion by denying his request for a court order permitting an interview of Broderick Boone and by refusing to permit him to amend his petition. On November 17, 1999, the court affirmed the judgment of the Court of Common Pleas. On February 16, 2000, the Ohio Supreme Court declined jurisdiction over Williams's appeal, finding that it did not

involve any substantial constitutional questions. On October 2, 2000, the United States Supreme Court denied Williams's petition for writ of certiorari.

On August 18, 2000, Williams filed a Notice of Intent to File Habeas Corpus Petition in the United States District Court for the Northern District of Ohio. Counsel was appointed, and, on January 31, 2001, Williams filed his Petition for a Writ of Habeas Corpus, which raised 24 claims for relief.[5] On February 20, 2001, Williams filed a motion to conduct discovery pursuant to Rule 6 of the Rules Governing Section 2254 Cases. On June 22, 2001, the district court denied Williams's motion, holding that Williams had not demonstrated "good cause" entitling him to discovery. On April 12, 2002, the district court denied Williams's petition. It held that Williams had procedurally defaulted the majority of his claims and that the balance of his claims lacked merit. The district court also denied Williams's request for an evidentiary hearing, finding that no material factual dispute made such a hearing necessary. On the same day, the district court denied Williams a certificate of appealability.

---

[5]Williams raised the following issues in his petition: (1) juror bias; (2) retention of "automatic death penalty" jurors; (3) improper dismissal of jurors; (4) *Batson* claim; (5) ineffective assistance of counsel at the guilt phase of trial; (6) prosecutorial misconduct; (7) *Brady* violations; (8) denial of right to experts; (9) various errors by trial court; (10) admission of crime-scene photographs; (11) lack of a complete transcript of proceedings; (12) cumulative error; (13) ineffective assistance at the penalty phase of trial; (14) ineffective assistance of appellate counsel; (15) improper aggravating circumstances; (16) omission of mitigation evidence at the penalty phase of trial; (17) improper jury instruction on sympathy at the penalty phase; (18) lack of meaningful proportionality review; (19) improper standards of review employed by the Ohio appellate courts; (20) lack of adequate state post-conviction procedures; (21) constitutionality of Ohio's capital punishment scheme; (22) aggravating factors did not outweigh mitigating factors; (23) allocation to the defendant of the burden of production for mitigating evidence during the penalty phase; and (24) failure of Ohio's capital punishment scheme to narrow the class of persons eligible for the death penalty.

However, on April 15, 2002, the district court amended its April 12 order and issued Williams a certificate of appealability. Williams filed a timely notice of appeal.

### *ANALYSIS*

## I. STANDARDS OF REVIEW

### A. Standard of Review and AEDPA

In a habeas proceeding, this court reviews a district court's legal conclusions de novo and its factual findings for clear error. *Wickline v. Mitchell*, 319 F.3d 813, 817 (6th Cir. 2003). However, when a district court bases its decision on a transcript from the petitioner's state trial, and thus makes no credibility determinations or other apparent findings of fact, the district court's factual findings are reviewed de novo. *Miller v. Francis*, 269 F.3d 609, 613 (6th Cir. 2001).

The standards set forth in the Antiterrorism and Effective Death Penalty Assistance Act ("AEDPA") govern our review of the state court decisions because Williams filed his petition on January 31, 2001, well after AEDPA's effective date of April 24, 1996.[6] *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003); *Macias v. Makowski*, 291 F.3d 447, 450 (6th Cir. 2002). Pursuant to AEDPA, a writ of habeas corpus will not issue unless the state court's adjudication of the claim

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[6]Williams's argument that AEDPA would have an impermissible retroactive effect if applied to his petition is discussed *infra* in Section I(B).

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2001). Under the "contrary to" clause, a court may grant a writ of habeas corpus "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a court may grant a writ of habeas corpus "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[C]learly established Federal law, as determined by the Supreme Court of the United States," refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. The state court decision need not cite Supreme Court cases, or even evince an awareness of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

Moreover, the findings of fact made by a state court are presumed correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The presumption of correctness also applies to factual findings made by a state appellate court based on the state trial record. *Brumley v. Wingard*, 269 F.3d 629, 637 (6th Cir. 2001) (citing *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981)).

Finally, under long-standing law, claims which have been procedurally defaulted generally are not subject to review. In particular,

In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

## B. Applicability of AEDPA Where Conviction Predated AEDPA

In this case, Williams's petition was filed after the effective date of AEDPA, but he was convicted before that date. Williams contends that the application of AEDPA is therefore "impermissibly retroactive" pursuant to *Landgraf v. USI Film Products*, 511 U.S. 244 (1994). Without elaboration, he recites that the application of AEDPA to his petition "attaches new legal consequences to pre-enactment conduct" by "affecting [his] substantive rights," by "changing the legal consequences of pre-enactment conduct," by "giving a quality or effect to acts which they lacked or failed to contemplate prior [to] their performance," and by "changing the relief that is available by restricting [his] right to such relief." This argument is unavailing.

*Landgraf* establishes a two-part inquiry to assess whether to apply "a federal statute enacted after the events in suit." *Id.* at 280; *see also Singleton v. Smith*, 241 F.3d 534, 541 (6th Cir. 2001). First, the court must "determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, there is no need to resort to judicial default rules." *Landgraf*, 511 U.S. at 280. Second, if "the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or

impose new duties with respect to transactions already completed," in which case the traditional presumption against retroactive legislation applies. *Id.* In determining whether a statute would have a retroactive effect, "familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance." *Id.* at 270. "A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment." *Id.* at 269.

This court, in line with other circuits, has held that the application of AEDPA to an application filed after AEDPA's effective date, but which involves a crime and a conviction predating AEDPA, does not have a "retroactive effect." *Lott v. Coyle*, 261 F.3d 594, 604 n.3 (6th Cir. 2001) (deeming petitioner's argument that the application of AEDPA to a petition challenging a pre-AEDPA conviction "would be unconstitutionally retroactive under *Landgraf* . . . wholly without merit"); *Caldwell v. Bell*, Nos. 99-6219 & 99-6307, 2001 WL 549419, at **2 (6th Cir. May 17, 2001) ("Other than making the general assertion that his 'legal expectations and entitlements were abruptly altered on April 24, 1996' when the AEDPA was enacted, Appellant advances no reason why this case constitutes an exception to the general rule which requires the amendments to apply to petitions filed after April 24, 1996."); *Coe v. Bell*, 209 F.3d 815, 823 (6th Cir. 2000); *Trice v. Ward*, 196 F.3d 1151, 1158-59 (10th Cir. 1999); *Mueller v. Angelone*, 181 F.3d 557, 571 (4th Cir. 1999). Williams has not demonstrated that his case merits a different result, given his failure to identify "any new legal consequences that, had he known of them in advance, might have in any way affected his conduct before filing his habeas petition," *Mueller*, 181 F.3d at 572, and his failure to show that he had acquired any vested rights in pre-AEDPA standards of review. *Compare In re Hanserd*, 123 F.3d 922, 931 (6th Cir. 1997) (holding that the application of revised § 2255, which would have barred the petitioner, who had filed his first § 2255 motion prior to AEDPA's enactment, from filing a second § 2255 motion, would have had retroactive

effect because the petitioner "might well have waited to file that initial motion" had he foreseen AEDPA's revision of § 2255).

## II. THE TRIAL COURT'S REFUSAL TO INVESTIGATE ALLEGED JUROR BIAS

Each of Williams's challenges to the trial court's conduct of voir dire is, in the end, without merit.

### A. Background

Williams argues that the trial court committed constitutional error by refusing to reexamine a venireman (Juror Eddleman) after the testimony of another venireman indicated that Eddleman may have concealed prior knowledge of the case on *voir dire*, by failing to dismiss Eddleman for cause because of alleged bias, and by failing to dismiss for cause another venireman (Juror Rohwedder) who testified to overhearing conversations about "fear" of Williams. We note at the outset that Williams has not cited—either in his brief or at oral argument—any Supreme Court precedent in support of his claims. We therefore have been left to find for ourselves the clearly established Federal law, as determined by the Supreme Court, underlying his argument.

The Sixth Amendment, made applicable to the States through the Fourteenth Amendment, guarantees a criminal defendant a trial by an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). The presence of even a single biased juror deprives a defendant of his right to an impartial jury. *See Morgan*, 504 U.S. at 729. "Qualified jurors need not, however, be totally ignorant of the facts and issues involved." *Murphy v. Florida*, 421 U.S. 794, 799-800 (1975).

To hold that the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 723. When faced with an allegation of bias, then, the question becomes "did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount*, 467 U.S. 1025, 1036 (1984). A trial court's finding of impartiality is a factual determination entitled to 28 U.S.C. § 2254(e)'s presumption of correctness, *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003), and may "be overturned only for 'manifest error.'" *Hill v. Brigano*, 199 F.3d 833, 843 (6th Cir. 1999) (quoting *Patton*, 467 U.S. at 1031).

"[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Morgan*, 504 U.S. at 729. "Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). However, "[t]he adequacy of *voir dire* is not easily the subject of appellate review," *Morgan*, 504 U.S. at 730, and "the trial court retains great latitude in deciding what questions should be asked on *voir dire*." *Mu'min v. Virginia*, 500 U.S. 415, 424 (1991). Of course, when reviewing a state court's conduct of *voir dire*, a federal habeas court's "authority is limited to enforcing the commands of the United States Constitution." *Id.* at 422. A state court's refusal to pose "constitutionally compelled" questions merits habeas relief. *Id.* at 424-26. Questions are "constitutionally compelled" only if "the trial court's failure to ask these questions

[renders] the defendant's trial fundamentally unfair." *Id.* at 425-26.

Because the "[p]reservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury." *Dennis v. United States*, 339 U.S. 162, 171-72 (1950), questions directed at potential bias may be constitutionally compelled. For example, when faced with the prospect of racial bias, a federal habeas court must inquire whether "under all of the circumstances presented there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be as 'indifferent as (they stand) unsworn.'" *Ristaino v. Ross*, 424 U.S. 589, 596 (1976) (quoting *Coke on Littleton* 155b (19th ed. 1832)); *see also Turner v. Murray*, 476 U.S. 28, 36-37 (1986) (holding that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias). However, the Supreme Court has "stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias." *Mu'Min*, 500 U.S. at 427.

Clearly established Supreme Court precedent dictates that "[w]hen a trial court is presented with evidence that an extrinsic influence has reached the jury which has a reasonable potential for tainting that jury, due process requires that the trial court take steps to determine what the effect of such extraneous information actually was on that jury." *Nevers v. Killinger*, 169 F.3d 352, 373 (6th Cir. 1999), *overruled on other grounds by Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000); *cf. United States v. Rigsby*, 45 F.3d 120, 124-25 (6th Cir. 1995) ("When there is a credible allegation of extraneous influences, the court must investigate sufficiently to assure itself that constitutional rights of the criminal defendant have not been violated."); *United States v. Shackelford*, 777 F.2d 1141, 1145 (6th Cir. 1985) ("A trial court's refusal to permit an evidentiary hearing may constitute abuse of discretion when the alleged jury misconduct involves

extrinsic influences."). Extrinsic influences include, for example, an attempt to bribe a juror, a juror's application for a job in the district attorney's office, and newspaper articles and media attention.[7] *United States v. Herndon*, 156 F.3d 629, 635 (6th Cir. 1998).

As indicated above, "[t]here is no per se rule that mere exposure to media reports about a case merits exclusion of a juror." *McQueen v. Scroggy*, 99 F.3d 1302, 1319 (6th Cir. 1996); *see also DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998) (en banc) ("[M]ere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint."). "To the contrary, in order to merit disqualification of a juror, the media reports must engender a predisposition or bias that cannot be put aside, requiring the jury to decide a case one way or the other." *McQueen*, 99 F.3d at 1319. Generally, a defendant's right to an impartial jury is secured if a juror attests that he can set aside any information he has obtained and render a verdict based on the evidence presented in court. *Irvin*, 366 U.S. at 722-23; *DeLisle*, 161 F.3d at 382. However, in "extraordinary" cases, *DeLisle*, 161 F.3d at 382, where the trial atmosphere has been "utterly corrupted by press coverage," *Murphy*, 421 U.S. at 798, a court must presume that pre-trial publicity has engendered prejudice in the members of the venire. *See, e.g., Sheppard v. Maxwell*, 384 U.S. 333, 358, 363 (1966) (finding that "inherently prejudicial publicity [] saturated the community" and that a "carnival atmosphere" reigned at trial); *Irvin*, 366 U.S. at 726 ("[C]ontinued adverse publicity caused a sustained excitement and fostered a strong prejudice" among the people of the county.).

---

[7]Examples of "internal" influences, in contrast, include the behavior of jurors during deliberations, the jurors' ability to hear and comprehend trial testimony, and the physical and mental incompetence of a juror. *United States v. Herndon*, 156 F.3d 629, 634-35 (6th Cir. 1998).

Finally, in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), the Supreme Court devised a test for determining whether a juror's non-disclosure during *voir dire* necessitates a new trial. To obtain a new trial, a party "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556. "The motives for concealing information," the court explained, "may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id.* Thus, *McDonough* teaches that the deliberate concealment of information on *voir dire* does not automatically give rise to a presumption of bias. *Zerka v. Green*, 49 F.3d 1181, 1186 (6th Cir. 1995). "If a juror is found to have deliberately concealed material information, bias *may* be inferred. If, however, information is *not* concealed deliberately*, the movant must show *actual bias*." *Id.* (internal quotation marks omitted) (emphasis in original).

## B. Trial Court's Refusal to Reexamine Juror Eddleman

Williams argues that the trial court imperiled his right to an impartial jury by failing to dismiss Juror Eddleman for bias after evidence arose which arguably indicated that she concealed prior knowledge of the case during *voir dire* and by refusing to reexamine Eddleman in light of that evidence. We conclude that the Ohio Supreme Court did not unreasonably determine that Eddleman was not biased and did not unreasonably apply clearly established federal law in holding that the trial court had not abused its discretion by refusing to reexamine Eddleman.

During *voir dire*, Eddleman denied having any prior knowledge of the case.[8] Later in *voir dire*, another venireman, Juror Parsons, claimed that Eddleman had told her that Eddleman "heard [the case] was from Youngstown and it had something to do with drugs," but that Eddleman "didn't know if that was true." J.A. at 2765. Under further questioning, Parsons elucidated,

To tell you the truth, I was only half listening because I don't know if she had her information correct. She said that she had spoken to someone who lived in Youngstown and was familiar with the case and that it involved drugs and that's all she knew and that's all she told me, who read it in the newspaper, I believe. And that's basically all she knew. I don't even know, like I said, if that's correct. She didn't know if that's correct.

J.A. at 2782. She further explained,

I don't know whether she herself had the conversation. She said—like I said, I was only half listening because I didn't know if it was true or not and really didn't care. I don't know whether it was someone in her family had spoken to someone in Youngstown or she had spoken to

[8]Specifically, the following colloquy transpired:

THE COURT: . . . Do you know any of the persons in this room, any parties?

JUROR EDDLEMAN: No, I don't.

THE COURT: Do you know anything about this case?

JUROR EDDLEMAN: No.

THE COURT: Except what I said?

JUROR EDDLEMAN: Just what I've heard through you.

J.A. at 2715.

this person or whatever. But the gist of what I got was just what I told the Judge, that someone had told her, and I don't know if it was her husband talked to someone or whatever, just that there was a case in Youngstown and it involved drugs.

Oh, there was something else. I said, "This case is two years old, who can remember what you read two years ago?" And she said—I said, "Why would it take two years for the case to come to court?" And she said they were unable to find the gentleman. I forgot about that. And that was all that was said.

J.A. at 2784-85.

Later, defense counsel requested that the court reexamine Eddleman in light of Parsons's testimony. J.A. at 3026-27. The court tentatively denied the request, but agreed to give the matter further consideration. J.A. at 3032-33. However, at this time, the court did give a general instruction to the venire admonishing the members not to discuss the case among themselves or with others and to avoid media reports about the case. J.A. at 3033-35. Additionally, in its preliminary instruction to the jury, the court ordered the jurors to disregard any information about the case from an outside source and not to repeat any such information to other jurors. J.A. at 3617. The court never called Eddleman back for further questioning.

At the start of trial, Williams moved for a mistrial, arguing, *inter alia*, that the court had jeopardized Williams's right to a fair trial by refusing to reexamine Eddleman, who was seated on the jury, in order to determine whether Eddleman had deliberately concealed prior knowledge of the case and whether any prior knowledge of the case had prejudiced Eddleman. J.A. at 617-18. The court denied Williams's motion, reasoning that "[a]ll of the jurors selected testified that they would be fair, impartial and base their verdict solely upon the evidence presented at trial." J.A. at 892.

Both the Ohio Court of Appeals and the Ohio Supreme Court held that the trial court had not abused its discretion by refusing to examine Eddleman further. The Ohio Court of Appeals found that Eddleman had not deliberately concealed her knowledge of the case, as Eddleman's responses to the court's questions "were not necessarily inconsistent" with the remarks later attributed to her by Parson because "at best, [Eddleman] seemed to have heard some gossip, the truth of which was uncertain." *State v. Williams*, No. 16418, 1995 WL 641137, at *7 (Ohio. Ct. App. 1995). The court further determined that, even if Eddleman had deliberately concealed information, "this fact would not inescapably lead to a presumption of bias" because "[t]he information that Eddleman purportedly knew and concealed—that the case was from Youngstown, it involved drugs, and that the state was unable to locate Williams for a period of time—consisted of elemental facts concerning the case." *Id.*

Because Williams had not challenged Eddleman for cause on the ground of deliberate concealment, the Ohio Supreme Court reviewed his claim under Ohio's plain error rule. *State v. Williams*, 679 N.E.2d 646, 652 (Ohio 1997). The court found that Eddleman had not "deliberately concealed the conversation because she did not know whether those rumors were true. Thus, her voir dire response was truthful—she did not know anything about the case." *Id.* The court also held that the trial court sufficiently inquired into the alleged misconduct. *Id.* at 652-53. The chief justice, joined by another justice, dissented, stating that the majority's "strained and unlikely interpretation of Eddleman's response" neither eliminated "legitimate concerns of concealment" nor absolved the trial court of "the obligation to investigate further in defense of Williams's constitutional rights." *Id.* at 665 (Moyer, C.J., dissenting).

In his federal habeas petition, Williams asserted that the trial court "abused its discretion" by failing to reexamine Eddleman to determine whether she "had improperly answered or evaded inquiries concerning [her] knowledge of

the defendant or the case." J.A. at 31. The district court rejected Williams's argument, concluding that the state courts' findings that Eddleman was not biased and had not deliberately concealed material information were not unreasonable. J.A. at 143. It stated, "accepting the testimony that Eddleman was not aware of the accuracy of her statements, the court's determination that Eddleman's responses on voir dire were truthful is not unreasonable in light of the facts presented." J.A. at 144.

On appeal, Williams contends that Eddleman was biased against him and that the trial court "abused its discretion" when it refused to recall Eddleman for further questioning. Though Williams's argument is somewhat muddy, there are three distinct circumstances possibly underpinning his claim of bias. First, Eddleman may have lied about her prior knowledge of the case on *voir dire*.[9] Second, Eddleman knew that Williams's case "involved drugs," that the case originated in Youngstown, and that Williams had eluded the authorities. Third, Eddleman learned of this information through a conversation with a third party, most likely an acquaintance in Youngstown or a member of her family (who in turn had learned of the information from someone in Youngstown).

In light of the record as it exists, the Ohio courts did not unreasonably determine that Eddleman was not biased. Williams insists that bias should be attributed to Eddleman because she lied about her prior knowledge of the case on voir dire.[10] However, the record does not establish that Eddleman deliberately concealed information on *voir dire* because there

_____

[9] In evaluating Williams's claim, we assume that Parsons accurately identified Eddleman as the woman she spoke with.

[10] The Ohio Supreme Court found that because Williams did not challenge Eddleman on this ground, Williams waived this claim. *Williams*, 679 N.E.2d at 652. However, because the State has not relied on Williams's procedural default in this regard, we proceed to the merits of Williams's claim. *See Trest v. Cain*, 522 U.S. 87, 89 (1997).

are eminently reasonable explanations for her negative answer to the trial court's question, "Do you know anything about this case?" *See Jones v. Cooper*, 311 F.3d 306, 311-12 (4th Cir. 2002) ("Given these eminently reasonable explanations for the supposed discrepancies between the juror's voir dire answers and the statements to the investigator, there is simply no basis upon which to conclude that the juror lied . . . ."). Eddleman may have misunderstood the court's question or her "knowledge" of the case may have temporarily slipped her mind. Or, as the Ohio Court of Appeals and the Ohio Supreme Court recognized, Eddleman may have responded truthfully as her "knowledge" consisted of "gossip" of questionable veracity.[11] Moreover, as discussed *infra*, even if Eddleman deliberately concealed information, that fact alone does not give rise to a presumption of bias. Thus, Williams cannot use Eddleman's alleged lie to show that the Ohio Supreme Court unreasonably determined that Eddleman was not biased.

Nor do the substance or the source of Eddleman's prior knowledge of the case demonstrate that the Ohio courts unreasonably determined that Eddleman was not biased. "[I]n order to merit disqualification of a juror, the media reports must engender a predisposition or bias that cannot be put aside," *McQueen*, 99 F.3d at 1319, and, as the Ohio Court of Appeals observed, the information that Eddleman purportedly concealed consisted of "elemental facts," *Williams*, 1995 WL 641137, at *7, which Eddleman learned anyway in the course

---

[11] Both the Ohio Court of Appeals and the Ohio Supreme Court found that Eddleman responded truthfully to the trial court's question because she did not know whether the "gossip" she heard was accurate. Given the state of the record, this is a reasonable factual determination. Nonetheless, however probable the Ohio appellate court's explanation for Eddleman's answer, it is possible that Eddleman lied to the trial court. Thus, the Ohio Supreme Court's finding that Eddleman's response was truthful does not by itself entirely dispose of Williams's argument that the trial court should have reexamined Eddleman in light of Parsons's testimony.

of the trial. Finally, there is no indication that the source of Eddleman's information attempted to influence Eddleman in any manner.

The rub, then, is whether the Ohio Supreme Court unreasonably applied *Ristaino*, *Mu-Min*, or other Supreme Court precedent on jury bias and the conduct of *voir dire* when it denied Williams's request to reexamine Eddleman. Ideally, of course, the trial court would have called Eddleman back for further questioning in order to determine whether in fact Eddleman had prior knowledge of the case, whether any prior knowledge left her with any impressions or opinions concerning the case, whether she could set aside any such impressions or opinions, and whether she deliberately concealed any prior knowledge. Upon final analysis, though, we cannot say that the trial court's failure to recall Eddleman rendered Williams's trial fundamentally unfair. *Mu'Min*, 500 U.S. at 425-26. The Sixth Amendment does not obligate state trial courts to investigate every allegation of bias or juror misconduct. *See id.* at 427 (noting the "wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias"); *Szuchon v. Lehman*, 273 F.3d 299, 313 (3d Cir. 2001); *cf. United States v. Rigsby*, 45 F.3d 120, 125 (6th Cir. 1995). Rather, a constitutional duty of inquiry arises only when "under the circumstances presented there was a constitutionally significant likelihood that, absent questioning about [the potential bias], the jurors would not be as indifferent as (they stand) unsworn," *Ristaino*, 424 U.S. at 596 (internal quotation marks omitted), or when "a trial court is presented with evidence that an extrinsic influence has reached the jury which has a reasonable potential for tainting that jury." *Nevers*, 169 F.3d at 373. Here, Williams has not shown that the Ohio appellate courts unreasonably concluded that there was no constitutionally significant likelihood that, absent questioning of Eddleman about her prior knowledge of the case, a biased juror (Eddleman) would sit on Williams's jury.

Williams's primary argument, as far as we can tell, is that further inquiry would have disclosed that Eddleman lied in response to the trial court's question about her "knowledge" of the case and that this act of dishonesty would have enabled Williams to challenge Eddleman for cause on the ground of bias. The Ohio Supreme Court's finding on a limited record that Eddleman responded truthfully to the court's question does not logically foreclose Williams's argument that further questioning should have been allowed so that Williams could demonstrate the contrary, but the Ohio Supreme Court's opinion can fairly be read as an explanation for why further inquiry was not constitutionally required. Overall, it was unlikely, at best, that Eddleman deliberately concealed her "knowledge" of the case. Williams offers no rationale for Eddleman's alleged prevarication,[12] and it appears most probable that Eddleman either deemed the "gossip" unresponsive to the court's question, as the Ohio appellate courts supposed, or misapprehended the question. The Ohio Supreme Court's opinion thus reasonably supports the trial court's determination not to have Eddleman questioned further.

Moreover, even if Eddleman had deliberately concealed prior knowledge of the case, this conduct would not have given rise to a presumption of bias on her part. As discussed earlier, a court may, but need not, presume bias if a juror deliberately conceals material information on *voir dire*. *Zerka*, 49 F.3d at 1186; *see also Fuller v. Bowersox*, 202 F.3d 1053, 1056 (8th Cir. 2000) (holding that "a juror's apparent dishonesty is not a sufficient predicate to obtaining a new trial" (internal quotation marks and punctuation omitted));

---

[12]In fact, the transcript of Eddleman's *voir dire* belies any argument that Eddleman intentionally lied about her "knowledge" of the case in order to stay on the jury. Had Eddleman been intent upon sitting on the jury, she presumably would have stated forthrightly that she could set aside any partiality for the death penalty and follow the court's sentencing instructions, instead of vacillating in her answers as she did. *See* Section III(B), *infra*.

*United States v. Langford*, 990 F.2d 65, 69 (2d Cir. 1993) (refusing to recognize "a *per se* rule based simply on whether a prospective juror had lied, without respect to whether the dishonesty had a bearing on her impartiality"); *cf. United States v. Boney*, 977 F.2d 624, 634 (D.C. Cir. 1992) (refusing to hold that "any false statement or deliberate concealment by a juror necessitates an evidentiary hearing"). As the Supreme Court has held, "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*, 464 U.S. at 556. Thus, courts have presumed bias in cases where a juror has engaged in a pattern of deceit or has concealed information that bears on his impartiality. For instance, *Williams v. Taylor*, 529 U.S. 420, 441-42 (2000), held that an evidentiary hearing was merited where a juror had concealed that she had been represented by the prosecutor in her divorce and that she had been married to a state witness, a deputy sheriff. And in *Fields v. Woodford*, 309 F.3d 1095, 1105-06 (9th Cir. 2002), the court held that an evidentiary hearing was necessary because a juror in a rape case concealed the fact that his wife had been raped. *See also Green v. White*, 232 F.3d 671, 677-78 (9th Cir. 2000) (a juror repeatedly concealed his prior conviction in order to get on the jury and stated during jury deliberations that he knew the defendant was guilty the minute he saw him and he wished he could get a gun and shoot the defendant himself); *Dyer v. Calderon*, 151 F.3d 970, 982-83 (9th Cir. 1998) (en banc) (a juror in a murder trial lied repeatedly about her brother's murder and refused to admit that certain of her relatives had been accused of crimes and that she herself had been a crime victim). Conversely, courts have refused to presume bias where the juror's dishonesty does not suggest partiality. The court in *Solis v. Cockrell*, 342 F.3d 392, 393, 399 (5th Cir. 2003), refused to presume bias where a juror failed to reveal the fact that he lived near the defendant and had "known of" the defendant for more than 20 years. The court in *Jones* held that a juror's failure to disclose that she had relatives who had been arrested or subject to trials did not create an implication of bias. 311 F.3d at 311, 313. And in *Langford*, the court

found no bias because the juror gave false answers to avoid embarrassment. 990 F.2d at 69-70. In the case at bar, Williams offers no explanation as to how a finding that Eddleman deliberately concealed her "knowledge" of the case might lead to a finding that Eddleman was biased, and we have identified none.

Further, as the Ohio Court of Appeals concluded, the substance of the purportedly concealed information would not have enabled Williams to challenge Eddleman for cause. Neither knowledge of "elemental facts," which were disclosed at trial, nor a conversation with a family member or a friend about the case, prior to impanelment, would disable Eddleman from serving as an impartial juror.[13] As we said in *Scott v. Mitchell*, 209 F.3d 854, 879 (6th Cir. 2000), "[a]llegations of jury bias must be viewed with skepticism when the challenged influence occurred before the jurors took their oath to be impartial." In summary, Williams has not explained how further questioning of Eddleman might have yielded a finding that Eddleman was biased. Therefore, we cannot conclude that the Ohio courts unreasonably applied clearly established federal law in refusing to reexamine Eddleman.

## C. Juror Rohwedder's "Fear"

Williams's contention that Juror Rohwedder was biased because she overheard conversations among other veniremen about "fear" of Williams is without merit. During *voir dire*,

---

[13]The cases cited by Williams provide an instructive comparison. In *United States v. Herndon*, 156 F.3d 629, 636-37 (6th Cir. 1998), a hearing was required because the juror may have had unsuccessful business dealings with defendant. In *United States v. Walker*, 1 F.3d 423, 429 (6th Cir. 1993), a hearing was required because jurors were given transcripts containing highlighted material which had been redacted from copies of video tapes shown to the jury at trial. Finally, in *United States v. Herring*, 568 F.2d 1099, 1103-04 (5th Cir. 1978), a hearing was required because jurors were potentially exposed during a trial to a newspaper article reporting death threats against a prosecution witness.

Rohwedder reported that she overheard "chatting" and "gossip" among other members of the venire about the case. J.A. at 3080. When asked whether she heard anyone say "anything about being afraid of Mr. Williams or his family," she responded, "Maybe in a general sense, that because of the nature of the case there's fear." J.A. at 3080-81. She elaborated,

> I think there's a very high emotional level right now and with all, like you said, the waiting, the speculation, the not knowing, the anxiety part of it, and it's very unnecessary. I feel that a lot of it has just mushroomed and it's too bad because you don't have to be talking 24 hours a day, you don't have to be worrying about things that you shouldn't have to worry about. I find fault with that part of the process.

J.A. at 3081. However, she volunteered, "I don't think anything that has been said in my presence has affected my opinion of anything. I'm just here to do what you ask me to do." J.A. at 3081-82.

Also during *voir dire*, Rohwedder opined that "[i]t's not just an ordinary day at the courthouse" because people entering the courthouse were required to pass through security, and she admitted "[i]t's a little unnerving." J.A. at 3082. However, the judge clarified that the security system had not been put in place for Williams's trial but instead had been implemented earlier in the year. J.A. at 3083-84. Specifically, he advised that "since this case started I think all the employees go through it, or basically. I think that's the only change. We've had the security for months. And it had nothing to do with this case at all. It had to do with the judges wanting more security in the building." J.A. at 3084. When asked whether "there is an impression in your mind then that Mr. Williams probably did this and that's why there has to be extra security," Rohwedder replied, "Not necessarily. I think everybody has to be guarded. There's a problem. You know, here we are." J.A. at 3085.

Williams did not challenge Rohwedder for cause and mentioned Rohwedder only in passing in his motion for a mistrial. Nevertheless, neither of the Ohio appellate courts invoked the plain error rule in reviewing Williams's claim. The Ohio Court of Appeals held that the trial court had not abused its discretion by failing to conduct further inquiry as to Rohwedder, noting that "Rohwedder stated that the venire members talked about the trial, but that no specifics were discussed." *Williams*, 1995 WL 641137, at *7. The Ohio Supreme Court held that the trial court had not abused its discretion by permitting Rohwedder to sit on the jury, explaining that, although Williams claimed that Rohwedder "was biased because she allegedly overheard discussion about security and possible retaliation . . . Rohwedder indicated that she had heard no such discussion." *Williams*, 679 N.E.2d at 652.

In his federal habeas petition, Williams referred to Rohwedder's testimony regarding "juror discussion about fear of the defendant" and her "observation of heightened security," in the course of arguing that the trial court failed to examine potential jurors "to assure [Williams] that an impartial jury was impaneled." J.A. at 30, 32. Interpreting the mention of Rohwedder as a challenge to Rohwedder's impartiality, the district court held that "the state court was reasonable in determining that Rohwedder was not biased." J.A. at 144. On appeal, Williams adopts the district court's construction of his claim, arguing that Rohwedder "was clearly biased as she testified to juror discussion about fear of [Williams] and that the observation of heightened security increased the emotional level of jurors."

Whatever the particulars of his claim, Williams has not shown that the trial court acted unreasonably with regard to Rohwedder. Williams has not explained what further questioning of Rohwedder was, in his estimation, constitutionally required. Likewise, the charge of bias is without merit. Rohwedder testified that she had heard "[n]othing specific" concerning juror fear of Williams, and

that she did not think that "anything that has been said in my presence has affected my opinion of anything." J.A. at 3080-81. Similarly, after the court clarified that security at the courthouse had not been heightened due to Williams's trial but rather had been improved months earlier, Rohwedder indicated that this would not affect her impartiality. J.A. at 3083-85. In light of Rohwedder's declarations of impartiality, the Ohio courts' finding of impartiality was a reasonable determination of the facts in light of the evidence presented, and Williams has not succeeded in rebutting the presumption of correctness afforded this finding. Simply put, Williams has not identified any constitutional error possibly meriting habeas relief in the trial court's treatment of Rohwedder.

### D. Trial Court's Failure to Conduct Additional *Voir Dire*

In the course of challenging the seating of Eddleman and Rohwedder on the jury, Williams asserts that the trial judge failed "to properly discharge his duty to guarantee, to a reasonable degree of certainty, that Petitioner received a fair trial from twelve jurors. In the face of actual juror misconduct and bias, the trial judge limited the voir dire examination of suspect jurors and abdicated his responsibilities altogether to make further inquiry." To the extent that this statement represents a challenge to the trial court's failure to conduct additional *voir dire* of jurors other than Eddleman and Rohwedder, Williams's claim falls short. Williams has not shown that pre-trial publicity rose to a level which infringed his right to a fair trial. *See Hill*, 199 F.3d at 844. Nor has he identified any particular juror who sat on his case, other than Eddleman and Rohwedder, who he believes was prejudiced against him. The Ohio Supreme Court held that the trial judge had not acted "unreasonably or arbitrarily restricted examination or investigation into the preconceptions of prospective jurors." *Williams*, 679 N.E.2d at 653. As Williams offers only the above-quoted passage in

support of any claim, we cannot say that the Ohio Supreme Court unreasonably applied clearly established federal law.

## III. CHALLENGES FOR CAUSE TO "AUTOMATIC DEATH PENALTY" JURORS

The Ohio courts did not unreasonably apply the Supreme Court's decision in *Morgan v. Illinois*, 504 U.S. 719 (1992), in denying Williams's challenges for cause to a pair of alleged "automatic death penalty" jurors.

### A. Legal Standard

A capital defendant may challenge for cause any "automatic death penalty" juror—*i.e.*, any juror who would "vote to impose death automatically if the jury found the defendant guilty." *Morgan*, 504 U.S. at 728. As a general rule, a defendant may excuse a juror for cause if "the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)). Applying this rule in the capital context, "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Id.* at 729. "Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a juror may challenge for cause any prospective juror who maintains such views." *Id.*[14]

---

[14]In his brief, Williams comments that he "was forced to use numerous peremptory challenges to remove [automatic death penalty] jurors for the court's failure to excuse them for cause." However, if a defendant removes a challenged juror by using a peremptory challenge, he forgoes a later challenge to the trial court's decision not to excuse the juror for cause. *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003); *Wolfe v. Brigano*, 232 F.3d 499, 502 (6th Cir. 2000).

A trial court's finding as to a juror's impartiality is a factual determination entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). *See Bowling v. Parker*, 344 F.3d 487, 519 (6th Cir. 2003); *Miniel v. Cockrell*, 339 F.3d 331, 338-39 (5th Cir. 2003). "[O]ur review is deferential, respecting the trial judge's proximity to the venire and the determinations of credibility and demeanor that *voir dire* involves." *Wolfe v. Brigano*, 232 F.3d 499, 502 (6th Cir. 2000). "The question is not whether the trial judge was wrong or right in his determination of impartiality, but merely whether his decision was 'fairly supported by the record.'" *Bowling*, 344 F.3d at 519 (quoting *Witt*, 469 U.S. at 433).

### B. Challenge for Cause to Juror Eddleman

The state courts did not make an unreasonable determination of fact in denying Williams's challenge for cause to Juror Eddleman. Initially, when questioned by the court, Eddleman expressed her reluctance to impose the death penalty. Later, when pressed by defense counsel, Eddleman did testify that she would "probably" sentence a capital defendant to death, given that any life sentence would carry with it parole eligibility.[15] However, she professed a "dislike" of all the sentencing options, and described a vote for a sentence of death as a "difficult decision." More importantly, later, in response to specific questioning by the trial court and defense counsel, she stated that she could follow the court's instructions and recommend a sentence of life imprisonment with parole eligibility if the aggravating circumstances did not outweigh the mitigating factors. Thus, the trial court's conclusion that Eddleman could serve impartially is fairly supported by the record.

---

[15]At the time of Williams's trial, the possible penalties for an offender found guilty of an aggravated murder charge and a death-penalty specification were death, life imprisonment with parole eligibility after serving twenty full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment. Ohio Rev. Code Ann. § 2929.03(C)(2) (Anderson 1993).

The court asked Eddleman several questions at the outset concerning her willingness to recommend a death sentence to the court.

COURT: . . . If you find yourself in that situation, could you make such a recommendation to the Court, that is, the defendant receive the death sentence?

JUROR EDDLEMAN: I believe in the death sentence but I think I would have a hard time deciding that's what—

THE COURT: It is a difficult decision to make.

JUROR EDDLEMAN: It is.

THE COURT: There is no question about it.

JUROR EDDLEMAN: The way I look at it is if you were going to say the death sentence, that you should be willing to be one of the ones that would be there and push the button or pull the lever, whatever they do. And I just don't think I could do that.

THE COURT: Nor would you ever be asked to.

JUROR EDDLEMAN: I know that.

THE COURT: However, the Court will give you instructions of law, both at the end of the first phase and also at the end of the second phase.

JUROR EDDLEMAN: Uh-huh.

THE COURT: And you and the balance of the jury would weigh in the second phase the aggravating circumstances against the mitigation—mitigating factors.

JUROR EDDLEMAN: Right.

THE COURT: And if you unanimously find the aggravating circumstances outweigh the mitigating factors, then you would be required to make a recommendation of death sentence.

The converse is true if you don't find that. That is, if the State fails to prove the aggravating circumstances outweigh the mitigating factors, then you have to recommend a life sentence and then decide which life sentence: 20 to life or 30 to life.

JUROR EDDLEMAN: I understand. Okay.

THE COURT: Now, I know it's not easy. Could you follow the instructions of the Court?

JUROR EDDLEMAN: Yes, I could.

J.A. at 2718-19.

Later during *voir dire*, defense counsel questioned Eddleman at length about her ability to impose a life sentence with parole eligibility.

[DEFENSE COUNSEL]: The flip side of the sentencing issue, which I'm interested in, is whether or not you would fairly consider the two life imprisonment sentencing alternatives if you were ever called upon to determine the sentence. Do you know what those two alternative are? The judge discussed them with you.

JUROR EDDLEMAN: Life.

[DEFENSE COUNSEL]: With parole eligibility after serving 20 full years is one alternative. The other is life with parole eligibility after serving 30 full years.

JUROR EDDLEMAN: No, I wouldn't.

[DEFENSE COUNSEL]: I'm sorry, you wouldn't?

JUROR EDDLEMAN: If he was convicted of the murders I would say no, I would not consider that with parole.

[DEFENSE COUNSEL]: Okay. Do you want to tell me why not?

JUROR EDDLEMAN: Because if the murders were committed I don't—I don't believe that they should ever be released.

* * *

[DEFENSE COUNSEL]: I will candidly tell you that I am now a little concerned that you cannot fairly consider the two life sentencing options. My concern is based upon what you just told me about being unable to consider them if the defendant was eligible for parole at some point in time.

JUROR EDDLEMAN: I wouldn't—I do not believe that there should even be parole considered if somebody would have committed the murder. That's what I mean.

[DEFENSE COUNSEL]: I understand. I understand that that's how you feel and there are whole segments of society that feel the same way you do. I may feel the same way you do. But how I feel doesn't account for anything in this case. And how you feel about eligibility for parole only bears upon this case if you cannot set your feelings aside and follow the instructions of the Court. Am I making sense so far?

JUROR EDDLEMAN: Just a minute. So I would—well, what I'm saying, I would not believe in the parole so therefore I would not be able to, if it was not the death sentence, I would not feel comfortable with the 20 year and the parole or the 30 year and the parole.

[DEFENSE COUNSEL]: I understand that's what you are saying. Are you telling me that if the defendant were convicted, that because there's a possibility of parole after 20 years or after 30 years that you would automatically vote for the death penalty?

JUROR EDDLEMAN: Oh—

[DEFENSE COUNSEL]: Would you?

JUROR EDDLEMAN: No. I couldn't say that. I guess I don't like any three of the choices, is what I'm saying.

* * *

[DEFENSE COUNSEL]: So that may make the rest of this easy since you don't like either of the three. Do you dislike them equally or do you dislike one more than the others?

JUROR EDDLEMAN: Let's see. I would say I dislike all of them.

[DEFENSE COUNSEL]: Okay.

JUROR EDDLEMAN: I mean, you know.

[DEFENSE COUNSEL]: What are we going to do about that? You dislike all that.

JUROR EDDLEMAN: Change the rules.

[DEFENSE COUNSEL]: Call our legislators, see if we can get a quick—

JUROR EDDLEMAN: Yes.

[DEFENSE COUNSEL]: You understand that you only have those three options if you get to the point—

JUROR EDDLEMAN:  Those three options, if it came right down to it, it would probably be the death penalty then.  If there was any remote chance of them being paroled, I would probably go with the death penalty.

[DEFENSE COUNSEL]:  Automatically, just because of the possibility of parole?

JUROR EDDLEMAN:  Yes.

[DEFENSE COUNSEL]:  And you are saying that even though you know that these three alternatives should start out even in your mind?  You are being honest with me.

JUROR EDDLEMAN:  Yes.

[DEFENSE COUNSEL]:  And because of what you are saying about the death penalty being automatic, because of the eligibility of parole, you would be unable to fairly consider life imprisonment, am I right?

JUROR EDDLEMAN:  If it was without ever a chance of parole, yes.

[DEFENSE COUNSEL]:  That's not the way it is.

JUROR EDDLEMAN:  Since we don't have a choice I would say the death penalty.

[DEFENSE COUNSEL]:  And you say that knowing that there are these life sentencing options that you should consider?

JUROR EDDLEMAN:  Because whenever I think about it I would think well, maybe 30 years down the line somebody may be getting out of prison and might meet up with one of my children or something.  That's what I'm thinking of whenever I think of it.

* * *

[DEFENSE COUNSEL]:  Is your bottom line, if I have to determine the sentence I'll vote death because there's eligibility for parole?

JUROR EDDLEMAN:  Yes.

J.A. at 2728-35.

Following this exchange, the trial judge questioned Eddleman about her ability to follow the court's instructions at sentencing.

THE COURT:  If you find that the State did not do its job and you find the State did not prove that the aggravating circumstances outweighed the mitigating factors, then you must recommend a life sentence.  There are two options.

JUROR EDDLEMAN:  Two options.

THE COURT:  You the jury would then decide, if that were the case, whether it would be 20 years to life or 30 years to life.  As pointed out by counsel there's no eligibility for parole until that minimum time is served, be it 20 or 30.  And not you or me determine after that if he has been rehabilitated, if he should be let out in society, the parole authority does that.

But knowing that's your choice, first finding whether the State proved aggravating circumstances outweighed the mitigating factors then you must give the death penalty, or if you find they didn't prove [this] then you must vote for a life sentence.  Can you follow the instructions of law?

JUROR EDDLEMAN:  Yes.

THE COURT:  You see your choice basically is in the finding of aggravating circumstances, whether they outweigh the mitigating factors.  If you find the State

didn't do their job and didn't prove it then you must recommend life.

JUROR EDDLEMAN: Life.

THE COURT: If you find the State did it then you—that is beyond a reasonable doubt—then you must find for the death penalty. Do you understand that?

JUROR EDDLEMAN: Yes.

J.A. at 2736-37.

Finally, defense counsel again questioned Eddleman about her ability to follow the court's instructions given her opposition to parole.

[DEFENSE COUNSEL]: Right now you have taken an oath to tell us the truth and obviously that's what you are telling us. Your feelings regarding parole eligibility, will that affect the balancing that the Judge described for you?

JUROR EDDLEMAN: No, I don't believe so.

[DEFENSE COUNSEL]: Do you think you could set these feelings aside or do you think you cannot set these feelings aside?

JUROR EDDLEMAN: Well, depending upon the evidence and everything I probably could.

[DEFENSE COUNSEL]: Okay. I'm a little confused. You understand why I'm confused or not?

JUROR EDDLEMAN: Okay.

[DEFENSE COUNSEL]: Okay.

JUROR EDDLEMAN: Let me explain this. Depending on the evidence, I don't know how to explain it.

[DEFENSE COUNSEL]: Take a deep breath and just tell us how you feel.

JUROR EDDLEMAN: Depending on the evidence, I don't know. I don't know.

[DEFENSE COUNSEL]: Let me ask you one final question.

JUROR EDDLEMAN: Rephrase it, please.

[DEFENSE COUNSEL]: If you had to go into a second phase here would these three possible penalties start out equally in your mind?

JUROR EDDLEMAN: Yes, equally.

J.A. at 2737-39.

The trial court denied Williams's challenge for cause to Eddleman without comment (J.A. at 2740), and the Ohio appellate courts affirmed this ruling. The Ohio Court of Appeals held that the trial court did not abuse its discretion by denying Williams's challenge for cause. It noted that, after Eddleman gave "conflicting statements" concerning her ability to consider a life sentence given the parole eligibility, "the trial court voir dired her and determined that she would follow the instructions on the law." *State v. Williams*, No. 16418, 1995 WL 641137, at *9 (Ohio Ct. App. Nov. 1, 1995). It concluded that "Eddleman's answers, on the whole, did not indicate that her views would impair her performance as a juror." *Id.*

The Ohio Supreme Court also held that the trial court did not abuse its discretion in denying Williams's challenge for cause. It conceded that Eddleman "vacillated in her responses to questions concerning the death penalty." *State v. Williams*,

679 N.E.2d 646, 654 (Ohio 1997). However, it noted that, in response to the trial court's questioning, Eddleman "indicated that she understood the balancing process for aggravating circumstances and mitigating factors and agreed that she could participate in that process, weigh the evidence fairly, and make the appropriate recommendation." *Id.* "Finding no abuse of discretion," the court concluded, "we therefore defer to the trial judge's discretion to determine whether Eddleman could indeed follow the law and be fair and impartial." *Id.* at 654-55. The chief justice, joined by another justice, dissented. He concluded, "Where statements suggesting bias predominate in quantity, specificity, and certainty, countered by a relatively few general statements that the juror believes he or she can follow the law and be fair, deference to the trial court defies the constitutional requirements." *Id.* at 669 (Moyer, C.J., dissenting).

The district court held that the state courts' determination that Juror Eddleman could be fair and impartial "was not in any way unreasonable." J.A. at 149. It noted that the trial court "explained the applicable law to Eddleman, noting that in some circumstances the jury would be required to recommend a life sentence even though they found the defendant guilty of murder," and then "asked Eddleman whether she could follow the instructions of law regarding the proper imposition of the death penalty." J.A. at 148. This interrogation, the court determined, was more than "general questions regarding Eddleman's impartiality and fairness." *Id.*

As the district court concluded, Williams has not shown that the state courts acted unreasonably in denying Williams's challenge for cause. Williams does not argue that the state courts incorrectly interpreted *Morgan*, but instead challenges the state courts' findings that Eddleman could set aside her aversion to a life sentence with parole eligibility and follow the trial court's sentencing instructions. This finding is a reasonable determination of the facts in light of the evidence

presented, and Williams has failed to rebut the presumption of correctness properly afforded such a finding.

Eddleman did not stake a firm "pro-death-penalty" stance, but rather expressed ambivalence about the death penalty. In response to initial questioning by the court, she admitted that a death sentence would be "a difficult decision." J.A. at 2718. She explained, "The way that I look at it is if you were going to say the death sentence, that you should be willing to be one of the ones that would be there and push the button or pull the lever, whatever they do. And I just don't think I could do that." *Id.* She responded to the prosecutor that she "probably could" sign the verdict form for a death sentence. J.A. at 2725. Similarly, in response to defense counsel's initial questioning, she revealed that, though she would not "feel comfortable" giving a life sentence with parole eligibility, she did not like any of the sentencing options. J.A. at 2731-32; *see also* J.A. at 2733 ("Juror Eddleman: Change the rules."). Only when pressed by defense counsel did she state that, given the three options, she "would probably go with the death penalty" and that her "bottom line" was that she would "vote for the death penalty because there's eligibility for parole." J.A. at 2732-33.

In the end, however, in response to further questioning by the court and defense counsel, Eddleman indicated that she could set aside her personal beliefs concerning parole and follow the court's instructions. The court explained the sentencing process in detail, and, in response to specific questions,[16] Eddleman affirmed that she could follow the

---

[16] In *Morgan*, the Court held that "general questions of fairness and impartiality" are not sufficient to establish a juror's impartiality, as a juror "could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed." 504 U.S. 719, 735 (1992). However, in the case at bar, the trial court inquired specifically about Eddleman's ability to follow the court's sentencing instructions. *Compare id.* at 723 (jurors had been asked "whether each could be fair and impartial" and whether they could

court's instructions. J.A. at 2736-37. Then, in response to further inquiries by defense counsel, Eddleman testified that she did not "believe" that her feelings regarding parole eligibility would affect the balancing process just described by the court, that she "probably could" set aside these feelings, and that the three sentencing options would "start out equally" in her mind. J.A. at 2738-39.

The Supreme Court has observed that "it is not unusual on voir dire examination" for prospective jurors to give "ambiguous and at times contradictory" testimony, *Patton v. Yount*, 467 U.S. 1025, 1039 (1984), as has happened here. Prospective jurors vary widely in education and experience, and have had no briefing by lawyers prior to taking the stand. They

> thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading.

*Id.* As the Court has instructed, "[i]t is here that the federal court's deference must operate, for while the cold record [may] arouse[] some concern, only the trial judge [can] tell which of [the] answers was said with the greatest comprehension and certainty." *Id.* at 1040.

These principles inform our conclusion that the trial court, and the Ohio appellate courts, reasonably determined that Eddleman could serve impartially. Eddleman evinced a lack of bloodthirst, professed a dislike for all the sentencing

---

follow the court's "instructions on the law even though you may not agree").

options, and attested to her ability to follow the court's instructions despite her aversion to parole. In sum, the trial court's finding of impartiality was "fairly supported by the record." *Bowling*, 344 F.3d at 519.

**C.  Challenge for Cause to Juror Camp**

The state courts did not make an unreasonable determination of the facts in denying Williams's challenge for cause to Juror Camp. Although, when first questioned by defense counsel, Camp expressed "concern" about sentencing a capital defendant to a term of life with parole eligibility, Camp later stated forthrightly that she would not automatically vote for the death penalty and that she could abide by Ohio's sentencing procedures. Thus, the state courts' finding of impartiality is fairly supported by the record.

Like Eddleman, Camp was questioned at length about her ability to impose a life sentence with parole eligibility during *voir dire.*

[DEFENSE COUNSEL]: Would you ever hesitate when you are considering these three options, would you ever hesitate to vote for one of the life sentences out of a concern that the defendant might be placed back out on the street through the parole process?

JUROR CAMP: That's something to think about.

[DEFENSE COUNSEL]: Okay. Would that concern cause you to simply reject out of hand those life sentences?

JUROR CAMP: It would be a concern.

[DEFENSE COUNSEL]: Would it be—again I have to ask you to look inside yourself. Would it be a concern to such an extent that even though Judge would say to you, Mrs. Camp, you and the other jurors are to look at these

three options equally, do you think it would be such a concern that even though you would want to follow Judge Winter's instruction you would say I just don't know if I can because I'm concerned about this parole thing?

JUROR CAMP: It would be one thing to be concerned about, along with everything else we would have to consider.

[DEFENSE COUNSEL]: Okay. Do you think that your concern about that would substantially impair or alter your ability to do that weighing process that we talked about a minute ago?

JUROR CAMP: No. It would have to be weighed together.

* * *

[DEFENSE COUNSEL]: [D]o you have an opinion or can you tell me how you feel about those life sentences as alternatives to the death penalty.

JUROR CAMP: I think if someone's sentenced to life then it should be life.

[DEFENSE COUNSEL]: Is your feeling about that so strong that it would cause you, if you are in the jury room in a second phase, to say well, there's a chance this guy might get out, I just can't vote for life, I don't care what the Judge said about weighing them, my feelings are so strong that I'm worried about this guy getting out?

JUROR CAMP: It could be.

* * *

[DEFENSE COUNSEL]: Are you saying that everybody who is found guilty beyond a reasonable doubt at that

first phase should automatically get the death penalty at the second phase?

JUROR CAMP: No.

* * *

JUROR CAMP: Your question back to me was if [everybody found guilty] beyond a reasonable doubt should be killed, I said no.

* * *

[DEFENSE COUNSEL]: That's what I want to know. If we get to that second phase, you heard the Judge say the prosecutor has to prove to you beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors in order for you to vote for the death penalty, do you recall that?

JUROR CAMP: We as a jury would have to feel that there was beyond a reasonable doubt.

[DEFENSE COUNSEL]: That's right.

JUROR CAMP: Right.

[DEFENSE COUNSEL]: That's right. And if you have a reasonable doubt as to whether those aggravating circumstances outweigh the mitigating factors, then you as a juror have to pick one of those life sentences.

JUROR CAMP: Right.

[DEFENSE COUNSEL]: Do you think you could do that? It's a difficult decision, I know. Do you think you could do it?

JUROR CAMP: It would have to be proved to me that it was—that actually the person is guilty.

[DEFENSE COUNSEL]: Okay. And then at the second phase—that would be the first phase, where they have to prove it.

JUROR CAMP: If I had doubts then I wouldn't vote for the death penalty.

[DEFENSE COUNSEL]: Okay when you say doubts—

JUROR CAMP: If I had doubts.

[DEFENSE COUNSEL]: You are talking about the weighing process that I described to you?

JUROR CAMP: Yes.

J.A. at 2493-2500.

The trial court denied Williams's challenge for cause to Camp. It concluded that "the testimony would indicate that [Camp] could perform her duties as a juror in accordance with the Court's instruction and the evidence." J.A. at 2502.

The Ohio appellate courts affirmed the trial court's ruling. The Ohio Court of Appeals held that the trial court had not abused its discretion in denying Williams's challenge for cause. It acknowledged that Camp stated that the possibility of parole "would be a concern," but it noted that Camp "also indicated that she would not automatically vote for the death penalty and that she would be able to consider equally all three of the sentencing alternatives." *Williams*, 1995 WL 641137, at *9. The Ohio Supreme Court also held that the trial court had not abused its discretion in denying Williams's challenge for cause, noting that Camp "did not automatically favor the death penalty" and "stated that she could consider all of the possible penalties and return the appropriate verdict." *Williams*, 679 N.E.2d at 654.

The district court held that the trial court's conclusion that Camp could be fair and impartial "was not unreasonable."

J.A. at 149. It concluded that, "When the death penalty process and the applicable laws were explained to her during voir dire, Camp indicated that she could follow the law and the court's instructions to return an appropriate verdict." *Id.*

The state courts reasonably determined that Camp could set aside any disinclination to vote for a life sentence and follow the trial court's instructions. At worst, when initially questioned by defense counsel, Camp stated that parole was a "concern" and that her feelings about parole "could" cause her to disregard the judge's instructions. J.A. at 2493 ("[Parole] would be a concern."); J.A. at 2496-97 (stating that her feeling that "if someone's sentenced to life then it should be life" "could be" strong enough to prevent her from voting for a life sentence). However, in response to further questioning by defense counsel, Camp indicated that she would not automatically vote for the death penalty and that she could apply the weighing process prescribed by Ohio law. She responded "no" to defense counsel's question, "Are you saying everybody who is found guilty beyond a reasonable doubt at [the] first phase should automatically get the death penalty at the second phase?" J.A. at 2498. She stated, "Your question back to me was if they are finding everybody beyond a reasonable doubt should be killed, I said no." J.A. at 2499. She agreed that "if you have a reasonable doubt as to whether those aggravating circumstances outweigh the mitigating factors, then you as a juror have to pick one of those life sentences." J.A. at 2499-2500. She stated that, "If I had doubts then I wouldn't vote for the death penalty." J.A. at 2500. Additionally, prior to defense counsel's questioning, Camp told the prosecutor, "I wouldn't say kill everybody" (J.A. at 2475-76), and that none of the sentencing alternatives "would have a leg up." J.A. at 2490. Simply put, Williams has not adduced sufficient evidence to overcome the state courts' finding that Camp could set aside any bias toward the death penalty and follow the trial judge's instructions.

## IV. CONSTITUTIONAL CHALLENGES TO OHIO'S CAPITAL PUNISHMENT SCHEME

Williams has preserved a number of constitutional challenges to Ohio's capital punishment scheme. However, this court has recently rejected each of these challenges and has upheld the constitutionality of Ohio's capital punishment scheme as a general matter. *Smith v. Mitchell*, 348 F.3d 177, 214 (6th Cir. 2003). Williams has not directed the court to any authority—in particular, any Supreme Court decision—compelling reconsideration of these decisions. Thus, we conclude that the Ohio courts did not act contrary to, or unreasonably apply, clearly established federal law in rejecting Williams's constitutional challenges to Ohio's capital punishment scheme.

### A. Ohio's System of Proportionality Review

Williams challenges Ohio's system of proportionality review, whereby the Ohio Court of Appeals and the Ohio Supreme Court "determine whether the penalty of death is unacceptable in the case under review because it is disproportionate to the punishment imposed on others convicted of the same crime." *State v. Steffen*, 509 N.E.2d 383, 394 (Ohio 1987). He contends that, in establishing proportionality review, Ohio has created a constitutionally protected liberty interest, and that Ohio has "reduced" proportionality review to "a meaningless, capricious procedure in violation of the Due Process Clause." Fatal to Williams's argument, this court has repeatedly rejected due process challenges to Ohio's system of proportionality review.

Under Ohio's capital punishment scheme, the appellate courts[17] are obligated to determine, among other things, "whether the sentence of death is appropriate." Ohio Rev. Code Ann. § 2929.05(A) (Anderson 2003). "In determining whether the sentence of death is appropriate, the court of appeals . . . and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases." *Id.* The appellate court "shall affirm a sentence of death only if the particular court is persuaded from the record . . . that the sentence of death is the appropriate sentence in the case." *Id.*

The Ohio Supreme Court has held that the proportionality review mandated by § 2929.05(A) "is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed." *Steffen*, 509 N.E.2d at 395. The appellate court "need only compare the case before it with other cases actually passed on by that court to determine whether the death sentence is excessive or disproportionate"; it need not "consider any case where the death penalty was sought but not obtained or where the death sentence could have been sought but was not." *Id.*

Williams argues that, by interpreting § 2929.05(A) in this fashion, Ohio has reduced its system of proportionality review "to a meaningless, capricious procedure in violation of the Due Process Clause." He concedes that in *Pulley v. Harris*, 465 U.S. 37 (1984), the Supreme Court held that proportionality review is not constitutionally mandated, but maintains that the Ohio legislature created a constitutionally protected liberty interest when it established a system of proportionality review. Thus, he insists that the Ohio Supreme Court's decision as to what cases are "similar" for

---

[17] Subsequent to Williams's conviction, Ohio's capital punishment scheme was amended to provide for direct appeal from the trial court to the Ohio Supreme Court. *See* Ohio Rev. Code Ann. § 2929.05(A) (Anderson 2003).

purposes of § 2929.05(A) "must be made in an environs of *some* 'reasonable and non-capricious' guiding principles, lest those decisions be completely arbitrary" in violation of the Due Process Clause. (emphasis in original) And he concludes that, given Ohio Revised Code § 2929.021(A)'s requirement that all capital indictments be reported to the Ohio Supreme Court, and given Ohio Revised Code § 2929.03(F)'s requirement that the trial court file an opinion with the appellate courts explaining its sentencing decision in any capital case, the only reasonable interpretation of "similar cases" for purposes of § 2929.05(A) is all capitally indicted cases, regardless of whether a sentence of death was imposed.

Williams pressed this argument without success in his direct appeal and before the district court. The Ohio Court of Appeals noted that the Ohio Supreme Court had rejected Williams's very argument in *Steffen*, *State v. Williams*, No. 16418, 1995 WL 641137, at *19 (Ohio Ct. App. Nov. 1, 1995), and the Ohio Supreme Court dismissed the entirety of Williams's constitutional challenge to Ohio's capital punishment scheme in a single sentence. *State v. Williams*, 679 N.E.2d 646, 660 (Ohio 1997). The district court held that, since the Constitution does not require proportionality review, "any inadequacy in a state-provided proportionality review, even if proven, does not entitle a petitioner to federal habeas relief." J.A. at 151.

This court has held repeatedly that Ohio's system of proportionality review complies with the dictates of the Due Process Clause. *See Smith v. Mitchell*, 348 F.3d 177, 214 (6th Cir. 2003); *Wickline v. Mitchell*, 319 F.3d 813, 824 (6th Cir. 2003); *Cooey v. Coyle*, 289 F.3d 882, 928 (6th Cir. 2002); *Buell v. Mitchell*, 274 F.3d 337, 368-69 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F.3d 417, 453 (6th Cir. 2001); *Greer v. Mitchell*, 264 F.3d 663, 691 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000). "Since proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison." *Buell*, 274 F.3d at 369. And this court has held

consistently that, in "limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed, Ohio has properly acted within the wide latitude it is allowed." *Id.*; *see also Wickline*, 319 F.3d at 824-25; *Coleman*, 268 F.3d at 453. Williams has not mustered any authority compelling this court to revisit these decisions, and we must conclude that the state courts did not unreasonably apply clearly established federal law in rejecting Williams's claim.

**B.   Prosecutorial Discretion**

Williams argues that Ohio's capital punishment scheme violates the Eighth and Fourteenth Amendments in that "[t]he virtually uncontrolled discretion of prosecutors in indictment decisions allows for arbitrary and discriminatory imposition of the death penalty." However, as this court recognized in *Wickline*, such a challenge to Ohio's capital punishment scheme is foreclosed by *Gregg v. Georgia*, 428 U.S. 153 (1976). 319 F.3d at 824. In *Gregg*, the defendant argued that Georgia imposed its death penalty in "an arbitrary and capricious manner" in that "the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them." *Id.* at 199. In two opinions, six justices squarely rejected the argument. *Id.* at 199 (opinion of Justices Stewart, Powell, and Stevens), 255 (White, J., concurring). Plainly, the Ohio courts did not act contrary to clearly established law in dismissing Williams's claim.

**C.   Mandatory Submission to the Jury of Pre-Sentence Investigation and Mental Examination Reports Requested by the Defendant**

Williams challenges a provision in Ohio's death penalty statutes stating that, if a defendant requests a pre-sentence investigation or a mental evaluation, the resulting report must be submitted to the jury. This provision, he argues, impairs a defendant's right to effective assistance of counsel and right

to control the presentation of evidence in violation of the Sixth and Fourteenth Amendments. Again, this court has previously rejected Williams's argument.

Under Ohio law, a capital defendant is entitled to a pre-sentence investigation and a mental examination. Ohio Rev. Code Ann. § 2929.03(D)(1) (Anderson 2003). However, a pre-sentence investigation and a mental examination are not permitted unless requested by the defendant. *Id.* If a defendant requests an investigation or an examination, the resulting reports must be provided to the court, the jury, and the prosecutor. *Id.* Additionally, the jury and the court must "consider" the report when sentencing the defendant. *Id.*

This court has rejected constitutional challenges to this provision. *Cooley*, 289 F.3d at 925-26 (unpublished appendix) (dismissing petitioner's argument that the submission requirement "prevents defense counsel from giving effective assistance and prevents the defendant from effectively presenting his case"); *Byrd*, 209 F.3d at 539 (rejecting the argument that Ohio's capital punishment scheme "violates defendants' rights to due process and effective assistance of counsel by allowing presentence investigation reports or mental examinations requested by defendants to be provided to the jury"); *see also Dennis v. Mitchell*, 68 F. Supp. 2d 863, 904 (N.D. Ohio 1999) (same). Moreover, it is difficult to see how the submission requirement impaired Williams's right to effective assistance of counsel and right to control the presentation of evidence. Williams was not required to, and did not, request the reports. Moreover, under Ohio Revised Code § 2929.024, indigent capital defendants may obtain, at the state's expense, an expert (and other services) reasonably necessary for presenting a defense at the guilt phase or the penalty phase. *See Glenn v. Tate*, 71 F.3d 1204, 1209 n.2 (6th Cir. 1995) ("When an expert is retained under § 2929.024, the defendant can decide for himself whether he wants to put the expert's findings before the jury."). Finally, because Williams has not cited any relevant authority, other than the Sixth and

Fourteenth Amendments, in support of his argument, we cannot conclude that the Ohio courts acted contrary to clearly established federal law in rejecting Williams's claim.

## D.  The "Mandatory" Nature of Ohio's Death Penalty

Williams argues that Ohio's capital punishment scheme creates a "mandatory death penalty" by requiring a sentence of death when the aggravating circumstances outweigh the mitigating factors.[18] This absence of discretion, he contends, denies a defendant an individualized determination of the appropriateness of the punishment in violation of the Eighth and Fourteenth Amendments.

Yet again, this court has squarely rejected Williams's argument. In *Buell*, the court concluded

> Buell's arguments are unavailing. In *Proffitt v. Florida*, 428 U.S. 242, 258, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the Supreme Court upheld a statutory scheme for weighing aggravating circumstances and mitigating factors that is similar to Ohio's, which lays out specific aggravating circumstances and mitigating factors that are to be considered at sentencing. Ohio Rev. Code § 2929.04. The Court also has approved of a statute that did not enunciate specific factors to consider or a specific method of balancing the competing considerations. *See Franklin v. Lynaugh*, 487 U.S. 164, 172-73, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988); *Zant v. Stephens*, 462

---

[18]Under Ohio's capital punishment scheme, "[i]f the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender." Ohio Rev. Code. Ann. § 2929.03(D)(2) (Anderson 2003). If, after receipt of a recommendation of death, and after an independent review of the evidence, the trial court finds, by proof beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating factors, "it shall impose sentence of death on the offender." *Id.* § 2929.03(D)(3).

U.S. 862, 875, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The Court has held that "it is constitutionally required that the sentencing authority have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to imposition of a death sentence." *Sumner v. Shuman*, 483 U.S. 66, 72, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987) (quoting *Gregg,* 428 U.S. at 189-90 n.38, 96 S.Ct. 2909). The sentence imposed on Buell complies with *Sumner* as well as the Supreme Court's holding in *Blystone*, 494 U.S. at 305, 110 S.Ct. 1078, that a death penalty is constitutional if it "is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances." In Buell's case, both the jury at the penalty phase of trial and the reviewing courts specifically considered the aggravating circumstances and mitigating factors presented and determined that capital punishment was appropriate. By weighing these specific considerations, it cannot be said that a mandatory death penalty was imposed on Buell.

274 F.3d at 368; *see also Coleman*, 268 F.3d at 442 ("[T]he Ohio scheme does not mandate the death penalty for any particular crime, and under § 2929.03(D) the death penalty decision making process is not shielded from judicial review."); *Byrd*, 209 F.3d at 539 (dismissing petitioner's argument that Ohio's capital punishment scheme unconstitutionally "fails to provide the sentencing authority with the option to choose a life sentence even if the aggravating circumstances outweigh the mitigating factors").

Williams has not cited any authority that compels reconsideration of this conclusion. The Supreme Court in *Spaziano v. Florida*, 468 U.S. 447 (1984), merely stated that a state "must administer [the death penalty] in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not."

*Id.* at 460. This court, applying Supreme Court precedent, has determined that Ohio's scheme ensures such an individualized determination of the appropriateness of the penalty. Justice Stevens' dissent from the Court's denial of a petition for writ of certiorari in *Smith v. North Carolina*, 459 U.S. 1056 (1982) (Stevens, J., dissenting denial cert.), noted that a potential ambiguity in a North Carolina jury instruction might prevent a jury from determining "that death is the appropriate punishment in a specific case." *Id.* at 1057 (internal quotation marks omitted). It does not follow that a statute requiring a sentence of death when the aggravating circumstances outweigh the mitigating factors is unconstitutional, and in any event the opinion of a single justice is not "clearly established Federal law" for purposes of federal habeas review. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000) ("That statutory phrase refers to the holdings . . . of this Court's decisions as of the time of the relevant state-court decision."). The Ohio courts did not act contrary to, or unreasonably apply, clearly established federal law in rejecting Williams's "mandatory death penalty" argument.

### E. Electrocution as a Method of Execution

Williams argues that Ohio's "reliance on electrocution as the statutorily-defined method of execution violates [the Eighth Amendment's] proscription against cruel and unusual punishment." However, this court has upheld the constitutionality of electrocution as a method of execution. *Smith*, 348 F.3d at 214; *Buell*, 274 F.3d at 370 (observing that "[e]lectrocution has yet to be found cruel and unusual punishment by any American court" and stating that "[w]e decline to be the first"); *Greer v. Mitchell*, 264 F.3d 663, 691 (6th Cir. 2001); *Byrd*, 209 F.3d at 539. Moreover, Ohio law now designates lethal injection as the sole means of execution, rendering his argument moot. Ohio Rev. Code Ann. § 2949.22 (Anderson 2003) ("[A] death sentence shall be executed by causing the application to the person, upon whom the sentence was imposed, of a lethal injection of a drug or a combination of drugs of sufficient dosage to quickly

and painlessly cause death."); *State v. Mack*, No. 62366, 2003 WL 21185786, at *11 (Ohio. Ct. App. May 19, 2003) ("[A]ll arguments relating to electrocution are now moot because Ohio in November 2001, amended R.C. 2949.22 to eliminate electrocution as the means of execution."). In short, Williams is not entitled to relief on the basis of his Eighth Amendment argument.

## F.   Other Constitutional Claims

Williams advances a number of additional constitutional challenges to Ohio's capital punishment scheme. Most notably, he argues that Ohio's scheme (1) constitutes cruel and unusual punishment, (2) lacks a standard for determining the existence of mitigating factors, (3) lacks a standard for weighing aggravating factors against mitigating circumstances, (4) permits the trier of fact to consider aggravating circumstances at the trial phase, (5) improperly encourages guilty pleas, (6) lacks a compelling state interest and fails to use the least restrictive means, and (7) permits the death penalty to be imposed in an arbitrary, capricious, and discriminatory manner. Williams has not cited any Supreme Court precedent supporting his claims, and this court has squarely rejected most of Williams's arguments. *Smith*, 348 F.3d at 213-14 (rejecting arguments (1)-(4)); *Wickline*, 319 F.3d at 824 (rejecting argument (7)); *Cooey*, 289 F.3d at 923-26 (rejecting arguments (2)-(5) and (7)), *Buell*, 274 F.3d at 367 (rejecting argument (7)); *Coleman*, 268 F.3d at 443 (rejecting argument (4)); *Greer*, 264 F.3d at 690 (rejecting arguments (1) and (6)); *Byrd*, 209 F.3d at 539 (rejecting arguments (5) and (7)). In summary, in dismissing Williams's constitutional challenges to Ohio's capital punishment scheme, the Ohio courts did not act contrary to, or unreasonably apply, clearly established federal law as determined by Supreme Court.

## V.   WILLIAMS'S PROCEDURAL DEFAULTS

The district court concluded that most of Williams's claims were procedurally defaulted. We agree.

### A.   Legal Background

When a petitioner defaults on a federal claim in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the petitioner can demonstrate (1) cause for the default and actual prejudice, or (2) that the failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). This court applies a four-part test to determine if a claim is procedurally defaulted. First, the court must determine whether there is a state procedural rule applicable to the petitioner's claim and whether the petitioner failed to comply with the rule. *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). Second, the court must determine whether the state court actually enforced the state procedural rule. *Id.* Third, the court must decide whether the state procedural rule is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. *Id.* Fourth, if the preceding questions are answered in the affirmative, the petitioner must demonstrate that there was cause for him to neglect the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.*

### B.   Ohio's Doctrine of *Res Judicata* as an Adequate and Independent State Ground

Williams's argument that Ohio's doctrine of *res judicata* does not constitute an adequate and independent state ground, and hence cannot bar review of a pair of Williams's claims, is without merit. During *voir dire*, Williams objected to the prosecutor's challenge for cause, based on *Wainwright v. Witt*, 469 U.S. 412 (1985), to a prospective juror allegedly holding anti-death-penalty views. Williams also objected,

based on *Batson v. Kentucky*, 476 U.S. 79 (1986), to the prosecutor's use of a peremptory challenge to remove the only remaining African-American from the jury panel. However, Williams did not raise either of these issues on direct appeal or in his state post-conviction proceeding.

As the district court properly concluded, Williams procedurally defaulted these claims. Williams did not exhaust his claims because he did not raise the claims on direct appeal in state court. As the Supreme Court held in *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." Because the claims would be procedurally barred under Ohio law, they are procedurally defaulted for purposes of federal habeas review. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002). Specifically, as the district court found, the claims are barred under Ohio's doctrine of *res judicata*, which provides in relevant part that a final judgment of conviction bars a convicted defendant from raising in any proceeding, except an appeal from that judgment, any issue that was raised, or could have been raised, at trial or on appeal from that judgment. *State v. Perry*, 226 N.E.2d 104, 105-06 (Ohio 1967).

Williams, however, contends that Ohio's doctrine of *res judicata* does not constitute an adequate and independent state ground. First, he argues that Ohio courts do not consistently apply this procedural rule in capital cases. Second, he argues that Ohio's post-conviction system does not meet the requirements of due process in that it does not provide adequate discovery.

Williams's arguments are without merit. First, "this court has rejected claims that Ohio has failed to apply [the doctrine of *res judicata*] consistently." *Greer v. Mitchell*, 264 F.3d 663, 673 (6th Cir. 2001); *see also Monzo v. Edwards*, 281 F.3d 568, 577 (6th Cir. 2002) (deeming Ohio's doctrine of *res judicata* an adequate and independent state procedural

ground); *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001) (holding that "Ohio's doctrine of *res judicata* as a procedural bar is regularly applied by the Ohio courts"); *Mapes v. Coyle*, 171 F.3d 408, 421 (6th Cir. 1999) (rejecting argument that Ohio's doctrine of *res judicata* was not firmly established and regularly followed). Second, Williams has not explained the relevance of his attack on the adequacy of Ohio's system of post-conviction review. In particular, he has not shown how a lack of discovery, or any other alleged flaw in Ohio's system of post-conviction review, prevented him from raising his *Batson* claim or his *Wainwright* claim on direct appeal. *See Smith v. Anderson*, 104 F. Supp. 2d 773, 792-93 (S.D. Ohio 2000) ("Any perceived deficiencies in Ohio's post-conviction system did not relieve petitioner of the obligation to raise these waived claims on direct appeal." (internal quotation marks omitted)). Moreover, this court has dismissed the contention that "*res judicata* was an inadequate procedural bar . . . because he was denied a reasonable opportunity to present his claims in state court," and held that *res judicata* is an adequate and independent state ground for barring habeas review of constitutional claims. *Coleman v. Mitchell*, 268 F.3d 417, 427, 429 (6th Cir. 2001).[19]

---

[19] In support of his argument, Williams cites three dated cases in which this court excused a petitioner from the exhaustion requirement because state procedures were ineffective to protect the rights of the petitioners. *See Keener v. Ridenour*, 594 F.2d 581 (6th Cir. 1979); *Allen v. Perini*, 424 F.2d 134 (6th Cir. 1970); *Coley v. Alvis*, 381 F.2d 870 (6th Cir. 1967). As this court has already observed, these cases concerned forgiveness of the exhaustion requirement, not the adequacy of *res judicata* as a state ground justifying foreclosure of a federal constitutional claim. *Coleman v. Mitchell*, 268 F.3d 417, 428-29 (6th Cir. 2001). This court has directly held in other cases that *res judicata* is an adequate and independent state ground, and those decisions are controlling on the issue. *Id.*

## C. Ohio's Contemporaneous Objection Rule as an Independent State Law Ground

One of Williams's prosecutorial misconduct claims is procedurally barred by Ohio's contemporaneous objection rule, which, contrary to Williams's argument, is independent of federal law. Williams charges that the prosecutor engaged in prosecutorial misconduct by impermissibly vouching for the credibility of Williams's accomplices during their testimony. However, Williams did not object to the prosecutor's actions at trial, and the Ohio Court of Appeals and the Ohio Supreme Court reviewed Williams's claim under Ohio's plain error standard. S*ee State v. Smith*, 731 N.E.2d 645, 655 (2000) (explaining that, under Ohio's "contemporaneous objection" rule, an appellant who fails to object waives later review of the issue unless he shows plain error). The district court held that Williams had procedurally defaulted the claim under Ohio's contemporaneous objection rule. J.A. at 134-35.

Conceding that Ohio's contemporaneous objection rule is firmly established and that the state courts actually enforced the rule against him, Williams argues that the rule is not independent of federal law. He cites a single unpublished opinion which held that a decision by an Ohio appellate court—holding that allegedly improper conduct by the prosecutor did not constitute plain error—did not rest on an independent state law ground. *Knuckles v. Rogers*, No. 92-3208, 1993 WL 11874, at **2-3 (6th Cir. Jan. 21, 1993). Specifically, in *Knuckles*, the court reasoned,

> In the case at bar, it is clear that Ohio has a contemporaneous objection rule, and that the Ohio courts treat the failure to object to a claimed error as a procedural default. . . . Since [the petitioner] failed to object contemporaneously to the allegedly improper remarks, he violated Ohio's contemporaneous objection rule and committed a procedural default. However, the procedural default did not foreclose all consideration by

> the Ohio appellate court; the Ohio court examined the record to determine if the allegedly improper remarks were "plain error."
>
> The basic inquiry in the plain error analysis is whether the defendant has been denied a "fair trial." Whether a person is denied a fair trial is a question to be resolved by applying the principles of federal constitutional law. Therefore, we conclude that the Ohio appellate court's decision was not independent of federal law.

*Id.*

However, the *Knuckles* decision has been subject to criticism, and this court has repeatedly held, in published decisions, that plain error review by an appellate court constitutes enforcement of Ohio's contemporaneous objection rule. *See Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 423-24 (6th Cir. 2003) (noting criticism of *Knuckles* and observing that "[w]e have previously held Ohio's contemporaneous objection rule to constitute an adequate and independent state ground"); *Mason v. Mitchell*, 320 F.3d 604, 636 (6th Cir. 2003) ("The Ohio Supreme Court reviewed for plain error . . . thus barring federal habeas review absent a showing of cause and prejudice."); *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001) ("We have held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground. . . . Moreover, we view a state appellate court's review for plain error as the enforcement of a procedural default." (citations omitted)); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) ("Controlling precedent in our circuit indicates that plain error review does not constitute a waiver of state procedural default rules."); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000) (questioning *Knuckles* and holding that Ohio's contemporaneous objection rule was an inadequate and independent ground). Our cases thus require the conclusion that Williams has procedurally defaulted his improper vouching claim by failing to abide by Ohio's

contemporaneous objection rule, an adequate and independent state ground.

## D.  Failure to Raise Claim Under the Same Theory in State Court

Williams has procedurally defaulted most of his theories of prosecutorial misconduct by failing to raise these specific theories in state court. In federal court, Williams has alleged eleven incidents of prosecutorial misconduct.[20] Williams did present a prosecutorial misconduct claim to the Ohio Court of Appeals and the Ohio Supreme Court; however, as discussed *supra* in Section V(C), this claim was based solely on the allegation that the prosecutor improperly vouched for the credibility of witnesses. Hence, the district court concluded Williams had procedurally defaulted the ten remaining allegations as they did not "rest on the same theory asserted in state court." J.A. at 134.

On appeal, Williams simply asserts that he "raised prosecutorial misconduct (claim 6) on direct appeal in state court." Apparently, he argues that, by raising the flag of prosecutorial misconduct in state court, he preserved his right

---

[20]In addition to the charge that the prosecutor impermissibly vouched for the credibility of Williams's accomplices, *see* Section V(C), *supra*, Williams alleges the following instances of prosecutorial misconduct: (1) introducing improper victim impact testimony; (2) comparing Williams to a wild animal during the guilt phase and the sentencing phase; (3) mischaracterizing evidence during closing argument; (4) commenting on Williams's credibility after he made an unsworn statement during the penalty phase; (5) relying on evidence illegally obtained by the police; (6) ignoring sustained objections by Williams to a line of questioning concerning a test for gunshot residue on Williams's hands; (7) advancing retribution as a motive for sentencing Williams to death during closing argument at the penalty phase; (8) violating *Brady*; (9) arguing improper aggravating circumstance; and (10) referring to the victims as "four shiny silver dollars" and to Williams as "a few rusty pennies" at the penalty phase.

---

to press any particular allegations of misconduct in federal court.

As the district court observed, "[t]his Circuit has held that the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). As Williams's ten allegations represent theories which are "separate and distinct from the one previously considered and rejected in state court," *id.*, he procedurally defaulted these claims.

## E.  Ineffective Assistance of Appellate Counsel as Cause and Prejudice

Williams puts forward a pair of ineffective-assistance-of-appellate-counsel claims ("IAAC claims") as "cause" for his procedural defaults.[21] The first IAAC claim that Williams asserts as "cause" for these defaults, which we term his "Direct Appeal" IAAC claim, alleges that Williams's appellate counsel was ineffective for failing to raise the defaulted claims on direct appeal.[22]   However, Wilson

---

[21]In addition to the claims discussed in Sections V(B)-(D), Williams procedurally defaulted a host of claims by failing to raise the claims in state court at all. These specific claims are: ineffective assistance of counsel at the guilt phase; *Brady* violations; denial of right to experts; various trial court errors; admission of crime scene photos; incomplete transcript of proceedings; cumulative error; ineffective assistance of counsel at the mitigation phase; ineffective assistance of appellate counsel; improper aggravating circumstances; mitigation not provided; improper jury instruction on sympathy; improper standards of review used by Ohio appellate courts; inadequacy of Ohio's post-conviction relief procedures; and various constitutional challenges to Ohio's capital punishment scheme. Williams concedes that he procedurally defaulted these claims, but attempts to revive them by means of the cause and prejudice exception and the fundamental miscarriage of justice gateway.

[22]Williams's argument here is undeveloped. Apparently, he believes that his Direct Appeal IAAC claim serves as "cause" for his procedural default of his claim of ineffective assistance of trial counsel (his "Trial

procedurally defaulted his Direct Appeal IAAC claim as well by failing to file a timely motion to reopen his direct appeal pursuant to Rule 26(B) of the Ohio Rules of Appellate Procedure. Therefore, he interposes his second IAAC claim (his "Rule 26(B)" IAAC claim), in which he argues that his appellate counsel's failure to advise him of his right to file a Rule 26(B) motion and the state's failure to appoint counsel *sua sponte* to pursue a Rule 26(B) motion constituted IAAC, as "cause" for his default of his Direct Appeal IAAC claim. However, assuming for argument's sake that his Rule 26(B) IAAC claim excuses his procedural default of his Direct Appeal IAAC claim, his Direct Appeal IAAC claim fails on its merits and, therefore, cannot serve as "cause" for the balance of his procedurally defaulted claims.

---

Counsel" claim) (as well as for his failure to raise his *Wainwright* and *Batson* claims on direct appeal), which in turns acts as "cause" for his procedural default of those claims not raised at trial. However, it is not clear that Williams could have raised his Trial Counsel claim on direct appeal. One of Williams's two attorneys on direct appeal also represented him in the trial court (J.A. at 16), and the parties have not addressed whether, under these circumstances, Ohio law would have permitted Williams to raise his Trial Counsel claim on direct appeal and, if so, whether his counsel could have been expected to raise the Trial Counsel claim on direct appeal. *Cf. State v. Lentz*, 639 N.E.2d 784, 785 (Ohio 1994) (holding that *res judicata* does not bar a defendant from raising a claim of ineffective assistance of trial counsel for the first time in a post-collateral proceeding if the defendant was represented by the same counsel at trial and on direct appeal or if "an actual conflict of interest enjoined appellate counsel from raising a claim of ineffective assistance of trial counsel on direct appeal"); *State v. Cole*, 443 N.E.2d 169, 171 n.1 (Ohio 1982) ("[C]ounsel cannot realistically be expected to argue his own incompetence"). Additionally, if Williams's Trial Counsel claim would have required resort to evidence outside the record, he could not have raised it on direct appeal. *See State v. Booker*, 579 N.E.2d 264, 268 (Ohio App. 1989). And, if Williams could not have raised his Trial Counsel claim on direct appeal, his counsel's performance on direct appeal cannot serve as "cause" for his default of the Trial Counsel claim. However, because Williams's Direct Appeal IAAC claim fails on its merits, we have no reason to ascertain, and analyze, the specifics of Williams's argument.

## (1) The law of IAAC with respect to Ohio criminal cases

We state here the accepted principles of law with regard to IAAC in the context of an Ohio criminal case. Attorney error does not amount to "cause" unless it rises to the level of a constitutional violation of the right to counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). *Monzo v. Edwards*, 281 F.3d 568, 577 (6th Cir. 2002). *Strickland* mandates a two-part test to determine whether a defendant was denied effective assistance of counsel:

First, defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

To satisfy the deficiency prong of *Strickland*, a defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable," a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. In other words, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted).

To provide effective assistance, appellate counsel need not "raise every nonfrivolous claim on direct appeal." *Monzo*, 281 F.3d at 579. In fact, the "process of winnowing out weaker arguments on appeal and focusing on those most likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Monzo*, 281 F.3d at 579 (internal quotation marks omitted)

To satisfy the prejudice prong of *Strickland*, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The prejudice prong "is not satisfied if there is strong evidence of a petitioner's guilt and a lack of evidence to support his claim." *Rust v. Zent*, 17 F.3d 155, 162 (6th Cir. 1994). The petitioner "must show that absent his counsel's error, the courts of appeal would have reasonable doubt with respect to his guilt." *Moore v. Carlton*, 74 F.3d 689, 693 (6th Cir. 1996).

A claim of ineffective assistance of counsel must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 452 (2000). And, as the Supreme Court has recently instructed, "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted." *Id.* at 453. However, the procedural default of an ineffective assistance claim may "*itself* be excused if the prisoner can satisfy the cause-and-prejudice standard with respect to *that* claim." *Id.* (emphasis in original).

Under Ohio law, claims of ineffective assistance of appellate counsel must be raised in a motion for reopening before the court of appeals pursuant to Ohio Rule of Appellate Procedure 26(B), rather than in a post-conviction proceeding pursuant to Ohio Revised Code § 2953.21. *State v. Murnahan*, 584 N.E.2d 1204, 1208 (Ohio 1992); *see also Wickline v. Mitchell*, 319 F.3d 813, 823 (6th Cir. 2003). Rule 26(B) reads

> A defendant in a criminal case may apply for reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel. An application for reopening shall be filed in the court of appeals where the appeal was decided within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time.

Ohio R. App. P. 26(B)(1). Williams did not file a Rule 26(B) motion nor otherwise attempt to raise any ineffective-assistance-of-appellate-counsel claim in state court.

### (2)   Application of IAAC law in this case

The district court held that Williams's Direct Appeal IAAC claim could not serve as cause for his procedural defaults because he had procedurally defaulted the Direct Appeal IAAC claim as well. J.A. at 125. The court further held that Williams's Rule 26(B) IAAC claim could not stand as "cause" for his default of his Direct Appeal IAAC claim because Williams did not have a constitutional right to counsel to pursue a Rule 26(B) motion. J.A. at 126. Finally, the court ruled that, even if Williams had preserved his Direct Appeal IAAC claim, this claim could not save the remaining claims from procedural default because Williams's appellate counsel was not constitutionally ineffective. "Williams's counsel," the district court concluded, "was not deficient for failing to raise on appeal nonfrivolous claims that counsel

decided as a matter of professional judgment not to press." J.A. at 129.

We agree that Williams's counsel on direct appeal was not ineffective for failing to raise the claims which are now procedurally defaulted. Before giving our reasons for this conclusion, though, we pause briefly to clarify a couple of matters.

First, we note that this court continues to wrestle with the issue of whether the Rule 26(B) procedure implicates the Sixth Amendment's right to counsel. In *White v. Schotten*, 201 F.3d 743 (6th Cir. 2000), applying pre-AEDPA law, a panel of this court held that Ohio criminal defendants have a federal constitutional right to effective assistance of counsel in connection with a Rule 26(B) application and that the failure of petitioner's counsel to file a timely Rule 26(B) application constituted "cause" for his procedural defaults. *Id.* at 754. Later, in *Lopez v. Wilson*, 355 F.3d 931 (6th Cir. 2004), applying AEDPA, another panel held that the Ohio Court of Appeals had not acted contrary to clearly established federal law as determined by the Supreme Court in denying the petitioner's request for appointment of counsel to file a Rule 26(B) motion. *Id.* at 933. The *Lopez* court distinguished *White* on the ground that AEDPA requires greater deference to state court decisions. *Id.* at 938. Subsequently, the court voted to vacate *Lopez* and hear the matter en banc. *Lopez v. Wilson*, No. 01-3875, 2004 WL 934989 (6th Cir. Apr. 20, 2004). Because we can resolve this matter without deciding whether Williams had a constitutional right to Rule 26(B) counsel, and because, quite inexplicably, the parties have not addressed *White*, we set this issue aside.

Second, it is not entirely clear that Williams has exhausted his IAAC claims. Williams has not filed a Rule 26(B) claim to date, and Rule 26(B)'s ninety day deadline has long expired. However, Rule 26(B) recognizes an exception to the ninety-day deadline in cases where "the applicant shows good

cause for filing at a later time." Ohio R. App. P. 26(B) (emphasis added). Arguably, the "good cause" avenue is not open to Williams, as the Ohio appellate courts have proved unsympathetic to the claim that a lack of effective assistance of counsel serves as "good cause" for purposes of Ohio Rule of Procedure 26(B), even in the wake of *White v. Schotten*. *See Eads v. Morgan*, 298 F. Supp. 2d 698, 705 (N.D. Ohio 2003) (collecting cases). However, the Ohio Supreme Court recently has accepted the following certified question from the United States District Court for the Northern District of Ohio: "Is an application to reopen an appeal under Ohio Rule of Appellate Procedure 26(B) part of the direct appeal from a judgment of conviction?" *Morgan v. Eads*, 805 N.E.2d 542 (Ohio 2004). In any event, we need not resolve this issue because we have the discretion to deny unexhausted claims on their merits, which we exercise to the extent necessary. 28 U.S.C. § 2254(b)(2); *see also Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).

Assuming for argument's sake that Williams's Rule 26(B) IAAC claim excuses his procedural default of his Direct Appeal IAAC claim, his Direct Appeal IAAC claim fails on its merits. Williams levels a broadside at his appellate counsel, charging that his counsel was constitutionally ineffective for failing to raise any claims which the court deems procedurally defaulted. However, Williams "does not have a constitutional right to have his counsel press nonfrivolous points if counsel decides as a matter of professional judgment not to press those points." *Coleman v. Mitchell*, 244 F.3d 533, 541 (6th Cir. 2001). His appellate counsel was not deficient for failing to raise the procedurally-defaulted claims as these claims are not clearly stronger than the claims raised by his appellate counsel on direct appeal. Moreover, we have reviewed the substance of Williams's procedurally defaulted claims and have determined that each of them lacks merit. Thus, he suffered no prejudice from his appellate counsel's performance. *See Buell*, 274 F.3d at 352. And because Williams has not established a constitutional violation of his right to counsel, his counsel's performance

cannot serve as "cause" for his procedural defaults. *Monzo*, 281 F.3d at 577.

## F.   "Fundamental Miscarriage of Justice" Gateway

The district court properly concluded that Williams cannot escape his procedural defaults by means of the "fundamental miscarriage of justice" gateway. A habeas petitioner can overcome a procedural default by demonstrating that "failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. 722, 750 (1991). The "fundamental miscarriage of justice" gateway is open to a petitioner who submits new evidence showing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* The gateway is also available to a petitioner who demonstrates that he is "actually innocent" of the sentence of death that has been imposed on him. To establish his "innocence" of the death penalty, a petitioner must "show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992). Importantly, a claim of innocence in this context is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Schlup*, 513 U.S. at 315 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

As the district court concluded, Williams has not approached the "actual innocence" standard. In support of his claim, Williams offers only the assertion that unidentified "evidence that should have been presented at trial and the mitigating phase, but was not due to ineffective

representation, is evidence which establishes Petitioner's ineligibility for the imposition of the death penalty." Given the strong evidence of Williams's guilt and Williams's failure to identify the new "evidence," our review of the record in this case does not permit us to say that Williams has made a showing of "actual innocence" permitting him to pass through the "fundamental miscarriage of justice" gateway.

## VI. WILLIAMS'S MOTION FOR DISCOVERY

The district court did not abuse its discretion in denying Williams's motion for discovery. *See Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001); *Byrd v. Collins* 209 F.3d 486, 516 (6th Cir. 2000). "Habeas petitioners have no right to automatic discovery." *Stanford*, 266 F.3d at 460. Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts permits a petitioner "to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." R. 6 R. Gov. 2254 Cases**.** Rule 6 embodies the principle that a court must provide discovery in a habeas proceeding only "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)). "The burden of demonstrating the materiality of the information requested is on the moving party." *Stanford*, 266 F.3d at 460.

Rule 6 does not "sanction fishing expeditions based on a petitioner's conclusory allegations." *Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir. 1997); *see also Stanford*, 266 F.3d at 460. "Conclusory allegations are not enough to warrant discovery under [Rule 6]; the petitioner must set forth specific allegations of fact." *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994).

Williams requested leave to serve four requests for production. The first request centered on an atomic absorption kit used to test Williams's hands for gunshot residue.[23] During the trial, Jeffrey Lynn, a forensic scientist at the Ohio Bureau of Criminal Identification and Investigation, testified that swabs from Williams's right and left palms showed levels of barium and antimony—substances commonly found in ammunition—consistent with gunshot residue. J.A. at 4587-90. However, Williams's accomplices had testified that Williams wore gloves during the murder; so, in order to square this testimony with the results of the atomic absorption test, the prosecutor attempted to elicit testimony from Lynn that the barium and antimony found on Williams's hands could have been transferred from the gloves to his hands when Williams took the gloves off. J.A. at 4590-98. Lynn was unable to offer an opinion on the state's "transfer" theory to a reasonable degree of scientific certainty, and the trial court instructed the jury to disregard Lynn's answers. J.A. at 4592-98.

Before the district court,[24] Williams indicated that he required this discovery to pursue his ineffective assistance of counsel claim. J.A. at 171. Specifically, he claimed that his trial counsel "was not effective on the matters dealing with [Lynn's testimony]" and that he "was not afforded an expert necessary to challenge the transfer theory." J.A. at 171. The

---

[23] *Request for Production No. 1*: Produce the atomic absorption kit and samples submitted for examination to the Ohio Bureau of Criminal Identification & Investigation, all documents identifying the testing procedures and processes conducted on the samples, and all reports generated or produced in connection with the analysis and/or testing of the samples. J.A. at 170.

[24] Before this court, Williams simply announces, "Good cause for discovery clearly exists. Petitioner has asserted claims in his petition for a writ of habeas corpus which, when fully developed, will demonstrate that he is confined illegally and is entitled to relief."

district court denied Williams's request, concluding that "[a]ny discovery related to the state's 'transfer theory' is unnecessary because the trial court excluded this theory from the jury's consideration." J.A. at 2048.

The district court properly denied Williams's first request for production. As previously discussed, Williams has procedurally defaulted his ineffective assistance of counsel claims. Moreover, the trial court—on the basis of trial counsel's objections—instructed the jury to disregard Lynn's testimony concerning the transfer theory, so Williams was not prejudiced by his trial counsel's alleged failure to "deal with" this testimony. As the Supreme Court held in *Strickland v. Washington*, 466 U.S. 668 (1984), "any deficiencies in counsel's performance must be prejudicial in order to constitute ineffective assistance under the Constitution." *Id.* at 692. Williams has not shown that the requested discovery could "resolve any factual disputes that could entitle him to relief." *Stanford*, 266 F.3d at 460.

The second and third requests involved a diagram of Alfred Madison's house, the site of the murders.[25] Two of Williams's accomplices, Broderick Boone and Dominic Cherry, testified that Williams drew two diagrams of the residence during a meeting attended by Broderick, Dominic, and Jessica Cherry, and that one of the diagrams was destroyed at Williams's request. J.A. at 4050-51, 4199-4201,

---

[25] *Request for Production No. 2*: Produce State's Exhibit 11 and 11A (original diagram of McGuffy Road residence and envelope), the major fingerprint cards for co-conspirators Broderick Boone and Jessica Cherry, and the identification of any fingerprint(s) in the indices of state or federal law enforcement authorities showing points of identification or classifications similar to the latent unidentified fingerprints discovered on State's Exhibit 11.

*Request for Production No. 3*: Produce State's Exhibit 11 and 11A (original diagram of McGuffy Road residence and envelope), the handwriting exemplars taken from Petitioner Williams, and all handwritings or exemplars of co-conspirators Jessica Cherry, Dominic Cherry and Broderick Boone. J.A. at 173.

4267, 4274-75. The other diagram was recovered by the police and analyzed by Sheryl Lynn Harris, a fingerprint examiner at the Ohio Bureau of Criminal Identification and Investigation. During the trial, Harris testified that she found three fingerprints on the diagram and that she tested these fingerprints against samples from Williams and Dominic. J.A. at 4575-76. She further testified that two of the fingerprints belonged to Dominic and that the third fingerprint did not belong to Williams or Dominic. J.A. at 4576. On cross-examination, she conceded that the third fingerprint was not tested against samples from Broderick or Jessica. J.A. at 4581-82.

Before the district court, Williams stated that he required this discovery to pursue his ineffective assistance of counsel claim. J.A. at 173. Specifically, he contended that trial counsel's failure to ascertain whether the unidentified fingerprint belonged to Broderick or Jessica, and to commission a handwriting analysis to determine whether Williams or one of his accomplices drew the diagram, constituted ineffective assistance. J.A. at 173-74. Williams maintained that Broderick's and Dominic's credibility would have been seriously undermined if trial counsel had presented evidence that the fingerprint belonged to Broderick or Jessica or that Williams had not drawn the diagram. J.A. at 172-74. The district court determined that the requested discovery would not aid Williams's ineffective assistance claim, given that Williams's accomplices admitted viewing the diagrams. J.A. at 2048-49.

The district court did not abuse its discretion in denying Williams's second and third requests for production. Again, Williams has procedurally defaulted his ineffective assistance of counsel claim. Moreover, Williams has not shown that the requested discovery could yield evidence enabling Williams to prevail on his ineffective assistance claim. Broderick's and Dominic's testimony was consistent with a finding that Broderick and Jessica viewed and handled the diagram, so evidence that the diagram bore Broderick's or Jessica's

fingerprint would not have impugned Broderick's or Dominic's credibility. Regarding the handwriting samples, Williams makes no effort to explain how evidence that one of his accomplices—rather than Williams himself—drew the diagram would enable him to show prejudice sufficient to sustain an ineffective assistance of counsel claim. As the Supreme Court said in *Strickland*, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694.

The fourth request sought materials relating to any inducements offered to Jerome Gibson to testify against Williams.[26] Gibson was incarcerated with Williams after Williams's capture during the break-in at the JJC. J.A. at 4828. He testified that Williams confessed that he had arranged the murder of four men in connection with a dispute over "drugs" and "territory," though Williams would not say whether he actually shot the men himself. J.A. at 4829-32. He further testified that Williams confessed that he had broken into the JJC in order to "get the guys that turned State's evidence, made statements against him." J.A. at 4832.

Before the district court, Williams asserted that he "was prejudiced by the government's failure to disclose the information requested as such information constitutes favorable impeachment evidence which Petitioner's counsel would have used to impeach the testimony of Jerome Gibson." J.A. at 175. Williams did not identify the specific claim(s) that he hoped to advance with the requested discovery, though it appears that the discovery was directed at his *Brady* and ineffective assistance of counsel claims.

---

[26] *Request for Production No. 4*: Produce all information referring, relating or pertaining to any promise or inducement offered or conferred upon Jerome Gibson: (a) at any time preceding Petitioner's trial, and (b) in any way relating or resulting from his testimony at Petitioner Williams' trial. J.A. at 174.

The district court did not abuse its discretion in denying Williams's fourth request for production. This request appears to be a classic "fishing expedition," as Williams has not identified the "inducements" he expects to uncover. Moreover, regardless of the claim(s) underlying the request, Gibson's prior convictions provided ample ammunition for attacking Gibson's credibility, and any evidence of inducements for his testimony would have been cumulative. *See* J.A. at 4938-39 (defense counsel's closing argument). As the district court reasoned, "[b]ecause Gibson's credibility already had been seriously undercut by disclosing seven prior felony convictions, any further impeachment of his testimony would have been cumulative." J.A. at 2049. As this court stated in *Byrd*, "where undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." 209 F.3d at 518 (internal quotation marks omitted). Thus, Williams has not shown that the request for production might yield evidence enabling him to prevail on any of his claims.

## VII. WILLIAMS'S REQUEST FOR AN EVIDENTIARY HEARING

The district court did not abuse its discretion in denying Williams's request for an evidentiary hearing. *See Alley v. Bell*, 307 F.3d 380, 389 (6th Cir. 2002) ("We review a district court's decision not to conduct an evidentiary hearing for an abuse of discretion."). The district court denied Williams's request on the ground that it found no material factual dispute requiring such a hearing. J.A. at 142. On appeal, Williams suggests that the district court abused its discretion in denying his motion, but he fails to identify the subject of the proposed hearing. At his most specific, he demands a hearing in order to show that ineffective assistance of counsel serves as "cause" for any procedural defaults (Williams's Br. at 44), claims that the lack of a hearing "has also prejudiced

Petitioner with regard to AEDPA's 'presumption of correctness'" (*id.* at 69), and requests that "he be granted an evidentiary hearing in regard to all claims which were determined to be procedurally defaulted, or to which the presumption of correctness applies" (*id.* at 70-71). "However, even in a death penalty case, bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring the state to respond to discovery or to require an evidentiary hearing." *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003) (internal quotation marks omitted). Manifestly, the district court did not abuse its discretion in denying Williams's request, given his failure to specify which of his claims warranted an evidentiary hearing and what could be discovered through an evidentiary hearing. *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001).

### *CONCLUSION*

Based on our review of the record, the briefs, and the earlier opinions in this case, and our consideration of oral argument, we conclude that Williams has not established a claim for habeas corpus relief. We further conclude that the district court did not abuse its discretion in denying Williams's requests for discovery and an evidentiary hearing. We therefore **AFFIRM** the judgment of the district court.

### DISSENT

MERRITT, Circuit Judge, dissenting. I would issue the writ of habeas corpus because the jury selection process violated Williams' right to an "impartial jury" under the Sixth Amendment, as explained by Chief Justice Moyer in his dissenting opinion in the Ohio Supreme Court in this case.

Judge Rogers' complex 77-page opinion for the Court illustrates the highly complex, convoluted nature of our federal death penalty jurisprudence which depends on multiple layers of intersecting state and federal doctrines and, through various door-closing devices like "procedural default," prevents the Court from reaching many of Williams' claims on the merits. (See, for example, footnote 21.) Such a system, as has been often noted by judges and scholars, produces "randomized" executions with "no observable differences between outcomes in the 'standardless' discretion disapproved of in *Furman*, and the 'guided discretion' upheld in *Gregg*." Zimring, *The Contradictions of American Capital Punishment* 9 (2003). *See* Kozinski, *Death: The Ultimate Run-On Sentence*, 46 *Case W. L. Rev.* 1 (1995) (situation not different from the time the Supreme Court "wiped the slate clear of all death statutes" as our institutions "have gone about recreating and expanding the death penalty").

In such a randomized system, the capital case often is won or lost at voir dire. The voir dire and the method of jury selection become more important than the trial itself. Executions depend on "the line between innocence and guilt [which] is drawn with reference to reasonable doubt" by individual jurors, *Schlup v. Delo*, 513 U.S. 298, 329 (1995), and on the fact that just 1 of the 12 jurors is empowered to prevent the imposition of the death penalty by finding at the sentence stage that the mitigating factors outweigh the aggravating factors. *Mills v. Maryland*, 486 U.S. 367 (1988).

Thus the conduct of the voir dire and the number of pro-death-penalty jurors versus the number of jurors who disfavor the death penalty make a big difference in the outcome of the case. Execution may turn on the views of one juror.

The Sixth Amendment guarantees the right to an "impartial jury" in criminal prosecutions, not one biased in favor of automatically imposing the death penalty. In the present case, as Chief Justice Moyer suggests, we simply create a legal fiction when we say that Williams had an "impartial" or neutral and unbiased jury insofar as the death penalty is concerned. The trial court in this case administered a double dose of lethal rulings at the voir dire — those jurors who disfavor the death penalty were excused for cause, those who favor the automatic imposition of the death penalty for murder were not excused for cause.

The state prosecutor "death qualified" the jury and stacked it in favor of proponents of the death penalty before the case was tried. At the voir dire, the prosecutor was successful in having the court excuse for cause those jurors predisposed to disfavor the death penalty. Even though a quarter of the States and all members of the European Union have abolished the death penalty, jurors who would agree with the policy of these States and nations are said to be biased and unrepresentative and were eliminated from service on this jury. As a practical matter, this left a jury made up of pro-death-penalty jurors.[1]

---

[1] The practice of excusing jurors with scruples against the death penalty has a long history. Prior to 1968, state law controlled this process without federal court intervention. In *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the Supreme Court limited strictly such juror exclusion to just those jurors "who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence . . . or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." 391 U.S. at 522, n. 21. This rule was reversed in *Wainwright v. Witt*, 469 U.S. 412 (1985), eliminating "the requirement that a juror may be excluded only if he would never vote for the death

Chief Justice Moyer pointed out in his dissent for himself and Justice Pfeifer that the state trial court went much further than simply eliminating anti-death penalty jurors. It declined to excuse for cause jurors who would automatically impose the death penalty for murder. His dissenting opinion explains the situation clearly:

I would also reverse this conviction on the ground that Williams was not adequately protected from juror bias in favor of the death penalty. Of the nine prospective jurors for whom the trial court denied defense challenges for cause based on expression of death penalty bias, five were excused upon the exercise of peremptory challenges by defense counsel, another was excused for personal reasons, the number of one of the jurors was not reached, and two, Eddleman and Camp, were seated as jurors. Appellant argues that each of these prospective jurors was biased in favor of the death penalty. With regard to Eddleman, Scanlon and Subecz, I agree.

. . . .

Juror Eddleman again presents the greatest difficulties. The majority admits that Eddleman contradicted herself on voir dire. Despite her repeated statements that she would prefer death and would not consider alternative life sentences, the majority concludes that the court's rehabilitation of Eddleman was successful because "the trial judge's questions were more than general inquiries

---

penalty" and "the extremely high burden of proof" which *Witherspoon* had imposed upon the State. *Id.* at 421. In *Witt* a much more general standard was substituted (*i.e.*, that the juror's view "would substantially impair the performance of his duties"), and the state trial judge was given much broader discretion in the process. *Id.* at 420. In the view of many scholars and judges, the result that has emerged is a double standard favoring the prosecution in capital cases. *See* Holdridge, *Selecting Capital Jurors Uncommonly Willing to Condemn A Man to Die: Lower Court's Contradictory Readings of Wainwright v. Witt and Morgan v. Illinois,* 19 *Miss. C.L. Rev.* 283, 301-03 (1999).

---

regarding a juror's ability to be fair and impartial." I disagree. I believe this case represents precisely the sort of rehabilitation the United States Supreme Court intended to prohibit in Morgan v. Illinois when it held that general questions to a prospective juror by the court relating to fairness or impartiality cannot negate a statement by the prospective juror that he or she would automatically vote for death. 504 U.S. at 735-736, 112 S. Ct. at 2233, 119 L. Ed. 2d at 506-507.[2]

---

[2]The Chief Justice then describes the Eddleman voir dire in detail, 679 N.E.2d at 667-68:

Eddleman unambiguously affirmed that her preference for the death penalty would be automatic. Though consistent with her previous responses, such statements must arouse profound doubt as to whether impartiality would ever be possible for Eddleman. The exchange was the following:

"[Defense Counsel]. You understand that you only have those three options if you get to the point"

"Juror Eddleman. Those three options, if it came right down to it, it would probably be the death penalty then. If there was any remote chance of them being paroled, I would probably go with the death penalty."

"[Defense Counsel] Automatically, just because of the possibility of parole."

"Juror Eddleman. Yes."

"[Defense Counsel] And are you saying that even though you know that these three alternatives should start out even in your mind? You are being honest with me."

"Juror Eddleman. Yes."

"[Defense Counsel] And because of what you are saying about the death penalty being automatic, because of the eligibility of parole, you would be unable to fairly consider life imprisonment, am I right?"

*State v. Williams*, 679 N.E.2d 646, 664 (Ohio 1997).

After quoting the exchange between defense counsel and Eddleman in which the juror seven times said that she would always choose the death penalty over any other options such as life imprisonment (see footnote 1 below), the Chief Justice pointed out that the trial court's attempt at rehabilitation was ineffective:

> In contrast, Eddleman made very few responses suggesting that she could set aside her bias. Following the preceding exchange, the judge elicited a general response.
>
> "The Court: Mrs. Eddleman, do you agree that you can listen to and follow the instructions of the Court?"

---

"Juror Eddleman.  If it was without ever a chance of parole, yes."

"[Defense Counsel]  That's not the way it is.

"Juror Eddleman.  Since we don't have a choice[,] I would say the death penalty."

"[Defense Counsel]  And you say that knowing that there are these life sentencing options that you should consider."

"Juror Eddleman.  Because whenever I think about it I would think well, maybe 30 years down the line somebody may be getting out of prison and might meet up with one of my children or something.  That's what I'm thinking of whenever I thin of it."

. . . .

"[Defense Counsel]  Is your bottom line, if I have to determine the sentence I'll vote death because there's eligibility for parole?"

"Juror Eddleman.  Yes."

"Juror Eddleman.  Yes."

Then, after explaining the two phases of the trial and the sentencing options, the court asked, "Can you follow the instructions of law?"  Eddleman answered, "Yes."

*Id.* at 668.

The trial judge also weighted the jury selection process in favor of the death penalty with respect to juror Scanlon, as Chief Justice Moyer also pointed out in his dissenting opinion. Juror Scanlon gave the following set of answers to defense counsel's questions on the death penalty:

> MR. INGRAM:  And you have said that if you take someone else's life and it's a proven fact, that the death penalty should be imposed.
>
> JUROR SCANLON:  Yes.
>
> MR. INGRAM:  Well, what I want to know is if you get to a second phase and there's a murder which is a proven fact --
>
> JUROR SCANLON:  I would vote for the death penalty.
>
> MR. INGRAM:  Every time?
>
> JUROR SCANLON:  Yes.
>
> MR. INGRAM:  Automatically?
>
> JUROR SCANLON:  If it's an option given, yes.
>
> MR. INGRAM:  As long as the death penalty is an option you would vote for it every time you have a choice where there's been a finding of guilty for aggravated murder?

JUDGE SCANLON:  Yes.

. . . .

MR. INGRAM:  Did you say if he willfully and intentionally did it you would not even look at life imprisonment.

JUROR SCANLON:  Right.

MR. INGRAM:  If he willfully and intentionally did it it should be death?

JUROR SCANLON:  Right.

MR. INGRAM:  Automatically?

JUROR SCANLON:  Right.

MR. INGRAM:  Regardless of what could be said about the defendant?

JUROR SCANLON:  Right.

MR. INGRAM:  Because of the way you feel in a case where a defendant willfully and intentionally murdered someone you would want that defendant put to death?

JUROR SCANLON:  Yes, sir.

MR. INGRAM:  You wouldn't even consider life imprisonment as an option?

JUROR SCANLON:  Not if he intentionally took someone else's life without any thought of what he did, no.

. . . .

MR. INGRAM:  If you find someone guilty of willful and intentional murder --

JUROR SCANLON:  Then I believe they should be put to death.

MR. INGRAM:  All the time?

JUROR SCANLON:  Yes, sir.

MR. INGRAM:  Regardless of what anybody says about anything?

JUROR SCANLON:  Yes, sir.

MR. INGRAM:  And you feel so strongly about it it may be very difficult for you to put your feelings out of your mind, correct?

JUROR SCANLON:  In that sense, yes.

MR. INGRAM:  In light of everything that you just told me, your feelings about the death penalty, in cases of willful and intentional murder, would prevent or substantially impair you from fairly considering life imprisonment as a sentencing option?

JUROR SCANLON:  I guess so.

Instead of following the requirements of *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) ("based on the requirement of impartiality . . . a capital defendant may challenge for cause any juror" who will "automatically vote for the death penalty" without really weighing the "aggravating and mitigating circumstances"), that such a juror be excused for cause, the trial court overruled the defense objection. Defense counsel then had to exercise a peremptory challenge. Surely, if those who disfavor the death penalty may be excused for cause, the Chief Justice is correct that the failure to excuse Juror Scanlon for cause also violates the Sixth Amendment

requirement of an unbiased jury. Juror Scanlon said 16 times that she would automatically impose the death penalty for first degree murder. There is no question about her strong predisposition to impose the death penalty in every murder case.

The Ohio death penalty system, as administered in this case, not only picks its jurors from those who favor the death penalty and eliminates those opposed. It picked jurors who would automatically impose the death penalty for first degree murder. That practice is inconsistent with the Sixth Amendment requirement assuring an "impartial jury" in criminal trials. The trial judge made fact findings and legal conclusions about the selection of the jury that practically assured the prosecution of a death verdict upon receiving a verdict of guilty. These errors not only violate *Morgan v. Illinois*, *supra*, but also the principle of *Woodson v. North Carolina*, 428 U.S. 280 (1976), invalidating under the Eighth Amendment the automatic or mandatory imposition of the death penalty. When those who disfavor the death penalty are excluded and strong death penalty proponents who would automatically impose it are included, the death penalty becomes the inevitable result. *Mills v. Maryland*, *supra*, which allows jurors to weigh aggravators and mitigators in favor of life also becomes a dead letter because the method of jury selection prevents such jurors from sitting. In upholding this system, the Court upholds the worst of double standards: get rid of jurors with death penalty scruples, keep the jurors who have no scruples about imposing it automatically. It is hard to think of a more unfair system of jury selection.[3]

I have serious doubts about the Court's disposition of several other questions — particularly those involving questions of procedural default — but I would not reach those issues because I would grant the writ on the Sixth Amendment ground explained by Chief Justice Moyer and Justice Pfeifer.

---

[3] *See* Holdridge, *supra*, note 1.